6p 269
93   89

TROTTER, adm'r, *vs* BLOCKER & WIFE, et al.

1. Chancery will assist and protect trustees in the performance of trusts whenever they seek the aid and direction of the court, as to the establishment, management or execution of them.

2. Equity subjects trusts to the same construction that a court of law does legal estates, and a *donee* must have capacity to take, whether it is attempted to convey title directly to the party himself, or to another, in trust for him.

3. The capacity of a slave so far as relates to a bequest of freedom, forbids his being a *cestui que trust :* therefore, where one, by his last will and testament, bequeathed freedom after his death, to his slaves, it was held, that they were not, under the will, entitled to freedom, but must be held subject to distribution, according to law, as in cases of intestacy.

4. Slaves, in this country, are not analagous in their condition, of the villeins of the feudal ages, but may be more aptly compared to the slaves of the ancient Greeks and Romans. They have not the capacity to take property, either by purchase or descent ; and as it regards their transmission from owner to owner, they are considered as personal property,— things, rather than persons.

5. The first article of the constitution of Alabama, in relation to slaves, is equivalent to a positive inhibition of the right of the owner to emancipate them, except only under such regulations as the legislature may prescribe. But, even under the statute of eighteen hundred and thirty-four, slaves cannot be emancipated, in this State, by will, either absolutely or upon condition, as such attempt at emancipation, would not be a compliance with the legislative direction.

Error to the Circuit court of Lawrence county.

Bill in Chancery. Richard Trotter, adm'r, with the will annexed, of all and singular, the goods and chattels, rights and credits, which were of William Butler, late of the said county, deceased, at the Spring term of the said court, eighteen hundred and thirty-seven, filed his bill, stating, that said William Butler, deceased, did, on the twenty-ninth day of August, eighteen hundred and thirty-two, sign, seal, publish and declare, his last will and testament, by which he declared that it was his will and desire, that his just debts should be paid by his executors, out of his personal estate.—That after his death, all and every one of his negro slaves should be free and emancipated—they and their heirs, forever. He also gave and bequeathed unto his said negroes, all his plantation utensils and kitchen furniture, and one year's clothing, and one year's provision, out of his estate; and if the laws of the State were such, that the said negroes could not remain within the limits thereof, free, then he gave and bequeathed the sum of one hundred dollars to the said negroes, to remove them to some other State in the Union. He also gave to his grand daughter, his silver table and tea-spoons, and brass kettle, and to his grand son, his watch. All the residue of the estate, he ordered to be equally divided between all his grand-children; and appointed his brother-in-law, Griffin Bayne, and his brother, Aaron Butler of Giles county, State of Tennessee, his executors, &c. That said William Butler departed this life, about the thirteenth day of March, eighteen hundred and thirty-six, and one Richard Burruss obtained letters of administration on the estate, from the judge of the Orphans' court of said county, as in cases of intestacy. That the orator, from the great confidence and friendship of testator towards him, was, and had been for many years, acquainted with his pecuniary engagements; and that, at the time of his death, as the orator was

advised, the debts amounted to three hundred and eleven dollars and fifty cents. That said Richard Burruss obtained of the Orphans' court of said county, and executed in the month of April, eighteen hundred and thirty-six, an order of sale of the estate of testator, except the negroes hereinafter specified, and the amount for which the property sold was twelve hundred dollars.

At the same time, he hired, for the balance of the year, to divers persons, the negroes belonging to the estate—all of whom the testator died possessed of, as follows, to wit: Dick, aged forty-two years; French, aged thirty-five years; Charlotte, aged twenty-four years, and her children, Arrenna, aged five years, and Emily, aged two years; Hannah, aged eleven years; Juliet, aged thirty-two years, and her children, Ann, aged seven years, and Moses aged two years; James, aged eleven years, and Wesley, aged nine years.— The hire for all which amounted to two hundred and forty-four dollars and fifty cents. That at the sale aforesaid, the specific legacies, plantation utensils and kitchen furniture, were also sold, and brought the sum of one hundred and three dollars and seventy-seven cents. That the negroes, with the addition of Lucetta, a child of Juliet, and about three months old, were hired out by said Burruss, for the current year, on the third day of January, for the sum of six hundred and one dollars.

That the next of kin of the testator, according to law, were Mary D. Blocker, wife of William Blocker, of Mobile, and Charles W., Francis K., Elizabeth and Jessima Butler, who were infants, and resided in said county of Lawrence, with their mother, Mrs Mary Butler. That the said next of kin had possession of some of said negroes, and evinced their determination not to deliver them to the orator, pretending that they had a legal property in them. That Aaron Butler, one of the executors, nominated in said last

will and tenement, departed this life, before its probate, and the other executor therein named, renounced the execution of the same. After due notice, and citation to, &c. said last will and testament had been duly proved, and admitted to record, by order of the judge of the Orphans' court of said county. That orator had been appointed administrator with the will annexed, of the testator, by order of the judge of said court, and to that effect had letters of administration, and that the letters to Richard Burruss, had been duly revoked.

That the negroes above mentioned, so far as they had discretion, and Juliet and Charlotte, for their children, who had obtained to years of discretion, were willing and anxious to avail themselves of the humane, just and legal bequests of their late master, William Butler, deceased, and to comply with the provisions of his last will and testament, by removing beyond the limits of the State of Alabama, (that they might not become a charge to the same, and if according to the policy of the same, they could not remain in the same and be free,) to any State of the Union, where they might enjoy but *qualified* freedom.

Complainant further represented, that he esteemed it his duty, as trustee, faithfully to carry into effect the last will and testament of the testator, according to his obvious and benign intentions—that he ought, as far as he could, pay over the specific legacies, or the proceeds of them, to the legatees, where the said specified legacies had been sold—that he ought to remove the negroes; and any children of the females that might thereafter be born, beyond the limits of the State, to some other State of the Union, where they might be free, and that he ought to pay the said negroes respectively the wages they had earned, since the decease of the testator, as also any wages that they might earn before they were removed from this State: That such a line of conduct involved no violation of

public policy, or the legal or equitable rights of the next of kin. Complainant esteemed the above to be the true and legal interpretation of the said last will and testament.

Orator further complained, that William Blocker, in right of his wife, Mary D.,—and Charles Butler, Francis Butler, Elizabeth Butler, Jessima Butler, and some of the relatives of the four last, insisted that the above was not a legal interpretation of said last will and testament: that as to any legacies or bequeasts to the said negroes, they were void and illegal, and as to the same, said William Butler died intestate. They also threatened to institute legal proceedings against orator, should he carry out, by his conduct, his interpretation of the said last will and testament. He was also apprehensive, should he do so, that he would be subjected to future inconvenience, by the assertion, in legal proceedings, of the claim and objections of the next of kin of said William Butler, deceased.

As it was possible, therefore, that orator might be mistaken, as to the interpretation of said last will and testament, and to the end, that the rights of all parties concerned, might be settled on proper principles, orator prayed, that said William Blocker and his wife, Mary D. and the said Charles W. Butler, Francis K. Butler, Elizabeth Butler and Jessima Butler, might be made defendants to the bill; that guardians *ad litem*, for the infants in the premises, might be appointed, and that full, true and perfect answers might be made, on oath, to all and singular the allegations and charges in the bill, and that writs of subpœna might issue, directed to the defendants, commanding them on a day certain, to appear in court, and that they might be perpetually enjoined from asserting any claim to the negroes, and that suitable directions and redress might be given to the orator, with his costs, &c.

The bill was accompanied with the affidavit of complainant, that the contents of the bill were true in

6p                35

substance and in fact, to the best of his knowledge and belief.

The separate answer of William Blocker and Mary, his wife, to the bill, admitted the death of William Butler, and that probate had been had of his last will and testament,—that a correct copy of the will was, set out in the bill; and that complainant had been appointed administrator of the estate of the deceased, with the will annexed. They admitted that the negroes mentioned in the bill, were those referred to in the will, and that they were correctly described.— They also admitted, that Richard Burruss was appointed administrator of said William Butler, the testator, and that his actings and doings, in relation thereto were correctly set forth in the bill. They also admitted the statement of the debts of the deceased, to be correctly stated; and further answering, according to the statute in such cases, they said, there was no matter or thing in the bill contained, good and sufficient in law, to prevent the defendants from asserting title to the slaves in the bill mentioned, as heirs at law of said William Butler, and therefore, they demurred in law to the bill, craved the judgment of the court in their behalf, and having fully answered prayed to be discharged, &c.

The answer of J. J. Ormond, guardian, *ad litem*, for Charles W. Butler, Francis K. Butler, Elizabeth Butler and Jessima Butler, infants, and next of kin of William Butler, deceased, to the bill of complaint exhibited against them, and William Blocker, and Mary, his wife, by Richard Trotter, administrator, with the will annexed, &c. stated, for answer, that it was true, that probate was obtained by complainant, of the will of said William Butler, deceased, and that respondents were the heirs at law of deceased; that the negroes described in the bill, were those referred to in the will, and were correctly described. It was further admitted, that Richard Burruss was appointed

administrator of the deceased, and that his actings and doings were correctly set out in the bill. Respondents had no knowledge of the transactions which had taken place, but believed the estimate of the debts, &c. was correct, and that the will was correctly set out in the bill. Respondents, further answering, according to the statute, said, there was no matter or thing, in the complainant's bill contained, good and sufficient in law, to deprive the defendants from asserting title to the slaves, in the bill mentioned, as heirs at law to the said William Butler, wherefore they demurred in law thereto, and craved the judgment of the court in their behalf, and having fully answered, to be discharged, &c.

Upon this bill and the answers thereto, the Chancellor below ordered and decreed, that complainant apply to the judge of the County court of Lawrence, under the statute of eighteen hundred and thirty-four, for a decree emancipating the negroes mentioned in the bill. It was further the opinion of the Chancellor, that the bequest of property to the negroes was void, and that the property belonged to the residuary legatees in the will mentioned. It was further the opinion of the Chancellor, that the negroes had no right to wages for their labor, before a decree for their emancipation. It was further ordered, that complainant pay the costs of the suit, out of the estate of the testator, in his hands to be administered.

From this decree complainant and defendants prayed appeals to the Supreme court, and by consent the cause was taken up, neither party giving bond and security.—Errors to be assigned by either party.

The plaintiffs in error then assigned for error—

1. That the court below erred, in not dismissing the complainant's bill.

2. The court erred, in decreeing that the administrator could apply to the judge of the County court to manumit the slaves in the bill mentioned,—where-

fore, they prayed that the decree might be reversed, and the bill dismissed, &c.

And the said Richard Trottor, the administrator, assigned for error, that the court below erred, in not decreeing the freedom of the slaves,—and,

2. By decreeing that the slaves were not entitled to the bequests in the will mentioned, and to the avails of their labor, since the disease of the testator.

*D. A. Smith*, for the plaintiff in error, said—That American slaves were rational human beings, whose relations to their masters were regulated, in the absence of statutory provisions, by analogies and principles, deducible from the *Roman civil law*.—2 Kent's Com. 253 ; 1 Bay. 260; 4 Dess. 266.—*Brandons vs Huntsville Bank*, 1 Stew. 340.

According to the Roman law, slaves were considered *mere things*,—so that the master had absolute control over the life of his slave. But the benign principles of our law, repudiated such inhumanity. By the civil law, slaves had privilege of purchasing their freedom.—2 Kent's Com. 249. The same principle had been recognised in New York, and other States of the Union.

By the civil law, masters could emancipate their slaves, *per testamentum*.—Coop. Jus. Lib. 1, tit. 5, pa. 14, pa. 416, in notes; 1 Brown's Civil Law, 108. Mr Leigh, in the revised code of 1819, of Virginia Laws, says, in note, p. 434—" The practice of emancipating slaves, seems to have been exercised prior to the year 1691 ; for, by an act of that year, it was provided that no negro or mulatto should, thereafter, be set free, unless the person emancipating, should provide for sending his freed man out of the country, within six months —in default of which, the freed man might be apprehended and sold, by the church-wardens : but the method of emancipation does not appear,—vide 3 Hen. Stat. at large, p. 87. It was enacted, by the act of

1723, that no slave should be emancipated, but for meritorious services, to be judged of by the governor and council.—4 id. p. 132; and so the law continued, till the revolution, 1748, edit. 1769, c. 31, s. 26.   The general right of emancipation was given by act of 1782, c. 21, and modified by act of 1805, c. 10, and by subsequent laws, referred to, in the sequel."

The same history of the right of emancipating slaves, is substantially given by *Marshall, arguendo,* and Judge *Carrington,* in case of *Pleasants vs Pleasants,* 2 Call, 331, 346.—"From the first introduction of slaves into Virginia, their owners, without any statutory provision upon the subject, seem to have exercised, an *unlimited power of emancipation,* until 1696. For many laws were made before that time, in relation to free negroes."—Judge Gun, 2 Rand. 238.   An act of Assembly of North Carolina, passed 1777, entitled "An act to prevent domestic insurrections, and for other purposes," has this recital,—" Whereas the evil and pernicious practice of *freeing slaves in this State,* ought, at this alarming and critical time, to be guarded against, by every friend and well-wisher to his country;" and enacts, *"That no negro or mulatto slave shall, hereafter, be set free, except for meritorious services,* to be adjudged of and allowed, by the County court, *and license first had and obtained therefrom:"* and goes on to provide, that if any master or owner shall, in any other manner, emancipate slaves, under certain provisions and directions. the slaves might be confiscated and sold, for the benefit of the State, and the freeholder apprehending them.

This *prohibitory and penal* statute of North Carolina, was the law of Tennessee, until 1801, when she passed "An act empowering the County courts to emancipate slaves." The recital to that act is, "whereas the number of petitions presented to this legislature, praying the emancipation of slaves, not only tends to involve the State in serious evils; but is also

productive of great expense: for remedy whereof,"
enacts, " That when any person or persons, being re-
sident of this State, and owners of slaves, which they
are desirous of setting free, they shall prefer a peti-
tion to the court of the county in which they reside,
setting forth the intentions and motives for such eman-
cipation; and if the court, upon examining the reasons
set forth in said petition, should be of opinion, that acce-
ding to the same, would be consistent with the inter-
est and policy of the State, the chairman thereof shall
report accordingly." Then goes on, requiring the pe-
titioner to give bond and security, to indemnify the
county, against such emancipated slave becoming a
public charge.----See constitution of this State, art. vi,
tit. "Slaves."

By reference to Toulmin's "Laws of Alabama,"
title "negroes and mulattoes, bond and free"—chap.
13,—it appears that acts were passed authorising va-
rious persons to emancipate slaves, and so far as the
conditions of said acts are specified, it does not ap-
pear that until December, one thousand eight hundred
and twenty-one, emancipations were on condition,
that slaves emancipated, should remove from the
state. The acts of 1821--2 were on that condition.
See same title, chap. 16, 17, 18, 19 and 20. Till
1821, I presume that emancipations were on condi-
tion that masters emancipating, should give bond and
security that slaves emancipated should not become
a charge to the state. The condition of emancipa-
tions since 1822, until the act of 1834, giving juris-
diction to judges of the County court, has uniformly
been, that bonds be given to indemnify the state a-
gainst persons emancipated becoming a public charge.
See acts of 1825, p. p. 122, 3, 4—12 persons emanci-
pated. Acts of 1830, p. p. 36, 7, 8, 9, 77—about 60
persons emancipated and *in several instances on the
applications of executors.* Acts of 1832, p. 98—12
persons emancipated. The act of 1834, doubtless

for the same reasons assigned in the preamble of the Tennessee act, transfers the jurisdiction before that time entertained by the legislature, to the judges of the County courts, the owner to give notice and the judge to determine upon application to emancipate, and if, in his opinion, slaves should be emancipated in consideration of long, faithful and meritorious services, or *for other good and sufficient cause shewn*, the said judge may proceed to emancipate and set free such slave or slaves," to remove out of the limits of the state, in one year after such emancipation, which is not to take effect until after such removal.

*Mr. Smith* thus stated the common or civil law principle---the acts of the legislatures of Virginia, North Carolina and Tennessee---the constitutional provisions and legislation of this state, touching the right of masters to emancipate their slaves---that had a decisive bearing upon this case.

That one may by *deed* so emancipate a slave as to divest himself and next of kin of all title in the slave, is a proposition that seemed to him incontrovertible. The objection to such a divestiture or abandonment of property in the slave, could only be made by the creditor of the person executing such a deed, or by the state whose policy is such, as declared by various statutes, that property so abandoned, would be confiscated and sold for the benefit of the state. A slave so emancipated would be taken up under the statute providing for the sale of runaway slaves. A deed manifestly fraudulent, which is as much against sound policy as any emancipation, however irregular, is binding upon the party executing it *and his heirs*.

*Is an emancipation, by will, of slaves, in this State, and provision made to remove them to some other State in the Union, if they cannot remain in this State and be free, void ?* . If so, it must be either because it is *malum in se* or *malum prohibitum*. To say that it is *malum in se*, is too monstrous, for the spirit of this age, and our

free institutions. If, according to the principles of *heathen Rome*, emancipations were not thought immoral, it would be quite disparaging to the influences which Christianity has been shedding upon the world, for eighteen centuries, *now*, to establish a contrary doctrine.

Judge *Roane* says, of the policy of emancipating slaves, (2 Call, 340,) it "must always be clear, to every friend of liberty and the human race---[344.]   As it is the policy of the country to authorise and permit emancipations, I rejoice to be an humble organ of the law, in decreeing liberty to the numerous appellors now before the court." As it will be an evil day, so I hope it may never come, when any State will counteract the just and generous wishes of a master in giving freedom to his slaves, either by deed or will, if consistent with the public safety.   *That supreme law* requires that the common or civil law right of emancipation, should be guarded with suitable cautions and restrictions.   Hence the various provisions, that slaves should not be emancipated but for meritorious services; as under that policy, they were to remain in the State, and as such meritorious services would constitute a sort of security for good conduct, and that they would thus not be troublesome members of society.---That when they were permitted to remain, indemnity should be given, that they should not become a public charge---and that, according to *our* recent policy, when emancipated, they should remove beyond the limits of the State.   (I have found no check or restriction against emancipations, to protect the cupidity of heirs, *claiming against an ancestor's will ;* I suppose that *public policy* does not require such check or restriction.)   These qualifications of the common law right of emancipation, are fully justified by the maxim, *sic utere tuo, ut alienum non lædus ;* and no right-minded owner emancipating a slave, has a right to complain of them.   If the emancipation of slaves,

by will, providing for their removal beyond the limits of the State, be not immoral, or against public policy, I demand the statute or constitutional provision *prohibiting it*.

The Supreme Court of the United States, in the case of *McCutchen et al. vs Marshall et al.*, 8 Pet. R. 220— (a case which I refer to, as pouring a flood of light upon this case,)—say, "As a general proposition, it would seem a little extraordinary, to contend, that the owner of property is not at liberty to renounce his right to it, either absolutely, or in any modified manner he may think proper. As between the owner and his slave, it would require the most explicit prohibition by law, to restrain this right. Considerations of policy, with respect to this species of property, may justify legislative regulation, as to the guards and checks under which such manumission shall take place; especially so as to provide against the public's becoming chargeable for the maintenance of slaves so manumitted." Where have we, in the constitution or laws of this State, any *"explicit prohibition,"* against a master's emancipating his slaves, by will, and providing for their removal out of this State, according to the polity of which, they cannot remain here, and be free? I have discovered no such prohibition.

But, it is contended, that the provisions in the constitution, as to slaves, are prohibitory of this right, and an analogy, (too far-fetched, as I am persuaded,) to support that notion, is deduced from article 1, sec. 8, of the Constitution of the United States; and the interpretation which has been given of a part of that section, with very distinguished ability, in *Gibbons vs Ogden*, 9 Wheat. R. 1. That case exhibits, in a very striking manner, the disastrous consequences that always result from a conflict of laws and jurisdiction of the General and State goverments, and shows, that to preserve the Union, and to secure the blessings to result from it, the federal sovereignty conferred in that

6p	36

section, must not be infringed upon, by State legisla-
tion.   When congress have acted in pursuance of the
powers accorded in that section, the States have no
right to legislate on the same subject, in contravention
of acts of congress.  But, in some particulars, in which
congress have not exercised the powers therein con-
ferred, the legislation of the States has been allowed
of, as in the instances of State bankrupt or insolvent
laws, and laws for organizing and disciplining the mi-
litia.

How very unlike this doctrine is the proposition,
that the making mention in the constitution, of one's
common law rights, is an abrogation of them.   Is there
any such necessary conflict between the common law
and constitutional liberty, as to produce such calamitous
results?   I think not.   The provisions in the consti-
tution of this State, in regard to slaves, do not take a-
way the common law rights of masters, in emancipa-
ting them.   Those provisions were, doubtless, intro-
duced, out of abundant caution, as the subject of sla-
very was of such peculiar interest and delicacy, that
the constitution could not well be too explicit about
it.   The section is *prohibitory*, so far as concerns the
emancipation of slaves, without the consent of own-
ers, and the prevention of emigrants to this State,
bringing with them such persons as are deemed slaves
by the laws of any, and of the United States, so long
as persons of the same description, shall be slaves in
this State.   But there the *prohibitory* character of the
section ends, and the remainder of it is *merely declar-
atory*.   " They shall have power to pass laws to per-
mit the owners of slaves to emancipate them, saving
the rights of creditors, and preventing them from be-
coming a public charge.   They shall have full power
to prevent slaves from being brought into this State,
as merchandize."   These last powers I characterise
as *declaratory*, because, I am persuaded, that if the
constitution had been silent, in regard to them, the

legislature, having general power to regulate our internal polity, could exercise them, without any specification in the constitution,—as has been done, in Virginia, North Carolina and Tennessee.

But, it may be said, that slaves have not been emancipated in this State, till the act of eighteen hundred and thirty-four, without acts of the legislature. To that, I reply that that necessity was induced by an act of eighteen hundred and five, (See Toulmin's Laws of Alabama, page 632,) which provided *that no slave should be emancipated, but for some meritorious act to the territory, or the owner, proven to the satisfaction of the legislature.* This act, positively *prohibitory,* (and which is the only act of this State, that has that semblance,) was the law of the land, until the first of January, eighteen hundred and thirty-four, when it was repealed, (see Aikin's Dig. 301, secs. 3 and 5.) and the common or civil law restored. But, it may be said, that the doctrine of *that,* as to the right of masters to emancipate slaves, by will, is of dangerous tendency. That, however, is a consideration of policy, which must be addressed to the *legislative* branch of the government.

Furthermore: If slaves could not be emancipated, but by acts of the legislature, *because of the mention made of the matter in the constitution,* how is it, that slaves have been introduced into the State, as merchandize, from time to time, without any act of the legislature sanctioning it? Again: under the sixth article of the constitution of this State, tit. " general provisions," other matters of policy, involving common law rights are mentioned. To instance arbitrations, sec. 18, and yet, has it ever been thought, for a moment, that *that* takes away the common law rights and remedies of parties, to a submission, not in pursuance of the statutes, which have been enacted to regulate arbitrations ?

What the comman law right of emancipation was,

is abundantly proven, by the history of the *prohibito-ry* legislation of Virginia, North Carolina, and our sta-tute of eighteen hundred and five.    When the statute of eighteen hundred and thirty-four was enacted, the right to emancipate slaves by will, providing to send them out of the State, did, or did not exist.    If it ex-isted, I can not see how, by any legitimate mode of construction, that statute abrogated that right.    As well might it he insisted, that a statute applicable to *burgains and sales* took away the right of disposing of property by *will.*    " The affirmative words of a sta-tute do not change the common law, without negative words added therein.    Thus, the statute of wills be-ing in the affirmative, doth not take away the custom to devise lands, in places where it existed before the statute."—Jenk. Cent. 212; Dyer, 155; 1 Inst. 111, ·115; 2 id. 200; Show. Parl. Ca. 64.

" If a statute without any negative words, declare that deeds shall have, in evidence, a certain effect, pro-vided particular requisites are complied with, this does not prevent their being used as evidence, though the requisites are not complied with, in the same manner as they might have been, before the statute passed."— *Jackson vs Brandt,* 2 Caine's R. 169.

"If a new remedy be given by a statute in a partic-ular case, this shall not be extended to alter the com-mon law, in any other than that case.    Or, as it seems better expressed by my Lord *Vaughan,* when a sta-tute alters the common law, the meaning shall not be strained beyond the words, except in cases of public utility, when the end of the act appears to be larger than the enacting words."—11 Rep. 59, *Foster's* case. Hob. 298; Carth. 36; Vaugh. 179.

"Statutes made in derogation of the common law, are to be construed *strictly;* and they are not to be construed as taking away the common law right, *unless the in-tention be manifest."— Melody vs Reab,* 4 Mass. T. R. 471; *Gibson vs Jenny,* 15 ib. 205.    See further, on this

subject, *Rex vs Robinson*, 2 Burr. 799. The cumulative rights and remedies of statutes, do not take away common law rights and remedies. To take these away by statute, it must contain *express prohibitory terms or negative words*, and the maxim *expressio unius est exclusio alterius*, does not apply in such cases. Doubtless many illustrations of the rule may be found in our statutes—to instance, the proceeding by petition and summons, (which does not take away the common law actions of debt and assumpsit on bonds and notes,) and the matter of arbitrations before adverted to.

In the act of eighteen hundred and thirty-four, there is nothing *prohibitory* of the common law right of emancipation. Nothing that is therein, is *restrictive of, or even modifies it*, except that it guards the public interest, by providing that persons emancipated shall remove out of the State, in one year after their emancipation. The judge of the County court, for long, faithful and meritorious services, *or for other good and sufficient cause shewn*, may emancipate slaves, to remove, &c. and saving rights of creditors. I can not conceive of a case, where such an application would be refused: for, if the characters of the slaves to be emancipated, were good, and their services had been faithful, it would be matter of *duty*, to emancipate; and if the reverse were true, that would be *good and sufficient cause* to promote the *interest* of the State, by sending out of it, such slaves.

The statute of eighteen hundred and thirty-four, is utterly unlike the *prohibitory and penal* law of North Carolina, which tolerated emancipations for *no other cause than meritorious services, and where license had been first had and obtained.* In that act no provision was made, against the emancipated slaves becoming a public charge, or for their being removed beyond the State. Hence, it was indispensable to the public

good, that only slaves of good character should be emancipated.   From this view of that statute it is apparent, that in this case, the case of *Haywood vs Craven's ex'or*, 2 N. C. Law Rep. 557, which may be relied upon, is not a pertinent authority.

But, if the right of emancipating slaves by will, providing that they should be sent out of the State, did not exist when the statute of eighteen hundred and thirty-four, was enacted, did it confer that right?— To say that it did not extend to the case of one *in extremis* emancipating slaves, by will, is contrary to the whole tenor of our legal polity, which favors limitations and provisions to effectuate the intentions of *testators*, that will not be connived at in *deeds*.    Hence the distinctions and differences, as to executory devises, and contingent remainders.

If the will of a testator emancipating slaves, and providing to remove them beyond the limits of the State, be not within the *letter*, it is surely within the *equity* of the statute.    It is substantially the same as the statute of *Tennessee, not North Corolina*, except that the Tennessee statute provides for bond, against the emancipated becoming a public charge, instead of their removing out of the State.    A judicial interpretation of that statute has been given by the Court of Appeals of Tennessee, in case of *Hope vs Johnson*, which has the decided approbation of the Supreme Court of the United States, in the case of *McCutchen et al. vs Marshall et al*, 8 Pet. Rep. 239–40.   The Court of Appeals say, " That no particular mode is specified, either by the act of seventeen hundred and seventy-seven, or eighteen hundred and one.   As between the master and the slave, the interest and volition of the master to emancipate, may be made known by any species of instrument that will completely evince it; and then nothing more is wanted but the assent of the State, expressed by its organ, the Court; which may show its determination by reporting on the petition, and

certifying the same; and by causing both the petition and the report to be filed among the records of the Court. The mind and desire of the owner may be as well expressed by will, as by any other instrument; and when it is made known by his will, the duty of his executor is, to use such legal means as may be effectual for the completion of his purpose."

In the case of *Pleasants vs Pleasants*, 2 Call, the Court aided in the execution of a will emancipating slaves, (which, at the time it was made, could not be done, but for meritorious services, with the sanction of the governor and council,) who claimed their freedom, in virtue of the act of seventeen hundred and eighty-two, which was passed after the death of the testator. In pronouncing a decree in that case, the Court more than once say, "So far, therefore, as concerns *the family*, they would have no difficulty in decreeing for the paupers, &c."

In the case under consideration, I humbly apprehend, that the Court should not view with favor, the claim of the grand-children, because it seems founded on an unnatural disregard of the wishes of an ancestor, whose benevolence they should venerate. Instead of that they seem desperately determined, as far as they can, to defeat it. This case, I trust, will be decided without delay,—without an over-strict regard to forms, and with reference to such intendments in favor of freedom, as must ever be dear to the lovers of human liberty.

I have no doubt of the unqualified jurisdiction of this Court to direct the complainant to execute the will, as he construes it. The jurisdiction is the same as if the statute of eighteen hundred and thirty-four had never been passed. "The designation of a certain person, to whom a new power is given by an affirmative statute, does not exclude another person, who was before authorised to do it, from doing the same thing."—*Foster's case*, 11 Rep. 64. Should the

court, however, have any misgivings as to this, as the complainant seeks directions as to the interpretation and execution of his trust, should it be deemed necessary, under the direction of the court, he will apply to the judge of the County court of Lawrence, for such a decree, or to the legislature, for such an act, as the emergency, *(if any)* of the case demands.

All other questions, as to the interpretation of the will, yielding in importance to the one which I have discussed, I commit, without remark, and with confidence, to the sound discretion of the court.

Before concluding, I will say a word, as to the right of the negroes, to the wages they have earned, since the death of the testator, or may earn. To answer the ends of justice, Equity often considers that as done, which ought to have been done. If the will had been executed according to its obvious meaning, without resistance of defendants, the negroes would have had the benefit of their labor. *The resistance of the defendants to the interpretation of the will, contended for by complainant, if that interpretation be right, cannot give the defendants the proceeds of the labor of the negroes, unless one may profit by his own wrong.*

COLLIER, C. J.—The plaintiff filed his bill on the equity side of the Circuit court of Lawrence, alleging that William Butler, late of that county, did, in August, eighteen hundred and thirty-two, make his last will and testament, in which, among other bequests, he declares,—"It is my will and desire, after my death, that all and every one of my negro slaves be free and emancipated, they and their heirs, forever.—I give and bequeath unto my said negroes, all my plantation utensils, and my kitchen furniture, and give them one year's clothing, one year's provision, out of my estate, and should the laws of my State be such, that the said negroes can not remain within the limits of the State, free, I give and bequeath the sum of one hundred

dollars, to the said negroes, to remove them to some other State in the Union."

The bill then states, that the testator died in March, eighteen hundred and thirty-six, that one of the executors, designated by him, died previously, and the other refusing the execution of the will, letters of administration *cum testamento annexo*, have been regularly granted to the plaintiff;—that the estate of the testator is indebted in a sum far below the extent of the available debts due it—and that the defendants are believed to be the next of kin, and legal distributees of the testator, and have expressed their determination to assert a right to the slaves intended to be incipated by his will. The bill then prays that it may be determined whether the slaves are entitled to be free, or whether the claim set up by the next of kin of the testator, is allowable.

The defendants answered the bill, not however, denying its allegations, but leaving it to be settled by the Court, whether so much of the will as relates to the freedom of the slaves, is valid. The Circuit court rendered a decree affirming the validity of the bequest, and referring it to the judge of the County court of Lawrence, to determine upon an application to be made by the plaintiff, for the manumission of the slaves, under the act of eighteen hundred and thirty-four. Both parties, being dissatisfied with the *decree*, appealed to this court; and the question is here presented, as it was below.

In the decision of every case in Equity, a preliminary inquiry is to be made—has the Court jurisdiction of the cause? The powers of Chancery are extraordinary, and its interposition can only be asked, when the ordinary tribunals are incapable of affording full and complete relief. In the case before us, the plaintiff sets out the will of his testator—states that the defendants insist upon the invalidity of some of its bequests, and assert a right to some of the testa-

6p                37

tor's estate; which, if allowed, must prevent the exe-tion of the will, *pro tanto.* Under these circumstan-ces, the advice of a court of Equity is sought, that the plaintiff may perform the duties imposed by the will, without incurring a personal responsibility.

Applications of this kind, are neither novel or unu-sual. It is the peculiar office of Chancery, to com-pel the performance of trusts, where trustees are ei-ther perverse or negligent. So, on the other hand, it will assist and protect trustees, in the performance of trusts, whenever they seek the aid and direction of the court, as to the establishment, management or exe-cution of them.* This case comes clearly within the principle here stated.—The bequests of the will are trusts imposed upon the executor or administrator, *cum testamento annexo,* and whether they are valid, and how to be performed, are questions on which the aid of the Court is asked.

In the case of *Blackledge, ex'or. vs Singleton et al.,*† where the plaintiff sought the directions of the court of Equity, how to distribute a certain portion of the estate of his testator, the jurisdiction was not ques-tioned. Considering the right of the Circuit court to entertain the cause, not to admit of serious contro-versy, we will proceed to inquire, whether the bequest, that it is the "will and desire" of the testator, that all of his negro slaves shall be "free and emancipated, forever," be legal.

If the bequest of freedom be considered as a lega-cy to the slaves, it can not be maintained,—for being, themselves, in servitude, they have not the capacity to take property, either by purchase or descent.— Slaves, in this country, are not analogous in their condition, to that of the villeins of feudal ages, but may be more aptly compared to the slaves of the ancient

---

*2 Story's Eq. 229-325.        †3 Murphey's R. 597.

Greeks and Romans. As it regards their transmission from owner to owner, they are considered as personal property, and rather as things than persons.—*Brandons vs Huntsville Bank;\**—*Walkers, ex'ors vs Bostick.*† And, upon this principle, it has been held, that a promise or declaration of emancipation made to a slave, or for his benefit, can not be enforced in a court of law or Equity.—*Beall vs Joseph.*‡ While an agreement made by a purchaser, with the seller, to emancipate a slave, in a given period, will be specifically enforced, at the suit of the seller.—*Thompson vs Wilmot.*§—To S. P. *Vide Cunningham's heirs vs Cunningham's ex'ors.*‖

That the owner of property is free to relinquish his right to it, at pleasure, as a general proposition, will not be denied; and the manner of the relinquishment, in the absence of legal restraints, must be left to his discretion. But the imposition of restraints, upon the exercise of this natural right, (the more especially as it respects slaves) is not only allowable, but the dictate of a wise policy. As a measure of expediency, the State owes it to its citizens at large, to protect their interests, by throwing suitable guards around the institution of slavery. If emancipation were allowed, at the mere volition of the master, consequences, disastrous to the quiet of the country would most likely result, — the public would be burthened with the charge of more paupers than it would be convenient to support, and slaves, themselves, would be turned loose upon society, who either from age, or the want of it, could not provide the comforts, or even the necessaries of life. And last, though not least, the demoralising tendency of such a policy would be such

\*1 Stew. Rep. 320.  ‡Hardin's R. 51.
†4 Dess. Rep. 266.  §1 Bibb, 422.
‖Cam. & Nor. 353.

as should induce every christian and philanthropist to deprecate its toleration.

The necessity of imposing checks upon the right of manumission, suggested itself to the convention which framed our *constitution.* Accordingly, we find it declared, in the first section of the Article relating to slaves, that "The general Assembly shall have no power to pass laws for the emancipation of slaves, without the consent of their owners, or without paying their owners, previous to such emancipation, a full equivalent, in money, for the slaves so emancipated." And again: "They [the general assembly,] shall have power to pass laws to permit the owners of slaves to emancipate them, saving the rights of creditors, and preventing them from becoming a public charge." This latter provision is a clear delegation of authority to the legislature to regulate, by law, the emancipation of slaves, and is quite as potent, as if it contained negative terms, inhibiting the exercise of such a right, but in obedience to the expressed will of the general assembly. Any other construction would make it an act of supererogation; for independent of such a grant of power, it was permissible at common law, for the owner to set at liberty his slaves. Why then confer this power upon the legislature by the constitution, unless it was intended thereby to abrogate the natural and common law right of the master. This provision can not be held to be merely declaratory of the legislative power, for that, if unrestrained by fundamental law, could not be questioned; and besides, this description of property was sufficiently secured by other guards in the constitution. I am strengthened in this view, by the fact, that until a general law was passed on this subject, in eighteen hundred and thirty-four, applications were made to the legislature, at every session, for leave to emancipate slaves, and in the invervening period after the adoption of the constitution, up to that time, there was no instance of emancipation being effected, otherwise than by legislative permission. *Contemporanea expositio fortissima est in lege.*

But we are not sustained alone by a continuous and tacit exposition of this feature of the constitution; for this court, in the case of *Isbell, Daniel, et al. vs Stamp's ex'or,*[*] at January term, eighteen hundred and thirty, decided that slaves could not be emancipated by will——that it was essential, that the authority should be given, either by general or special enactment. That case, it is true, was not argued, and no written opinion drawn out, yet, we can not conceive how the court could have decided otherwise.

Conceding the justness of this conclusion, independent of legislation, it has been argued by the plaintiff, that the statute of eighteen hundred and thirty-four, by an equitable construction, gives to the master the right to emancipate his slaves, by will, creating thereby, a trust for that purpose, which those charged with the execution of, may be compelled, or at least allowed to perform. By the act referred to, it is enacted, "That whenever the owner or owners of any slave or slaves, shall be desirous of emancipating such slave or slaves, such owner or owners shall make publication in some newspaper, printed within the county where such slave or slaves reside, (or, if there be no paper printed in said county, then in the nearest paper thereto,) for at least sixty days previous to the making application, in which shall be set forth the time and place, that such application will be made, together with the names and description of the slave or slaves sought to be emancipated; and at the time appointed the Judge of the said County court, may, upon petition filed, proceed to hear and determine upon the application so made, and if in his opinion, the said slaves should be emancipated, in consideration of long, faithful, and meritorious services performed, or for other good and sufficient cause shewn, the said judge may proceed to emancipate and set free, such slave or slaves; and the clerk of the said court

---

[*] No written opinion—never reported.

shall make record of the same, in a book to be kept by him for that purpose: *Provided*, that such slave or slaves shall remove without the limits of this State, within twelve months after such emancipation never more to return; and that such emancipation shall not take effect until after such removal."

This statute authorises the owner to make an application for the manumission of his slaves; and if it is to receive a construction according to its terms, it is material to ascertain who is to be regarded as such. The owner must be taken to be him, who is authorised to command the services and enjoy the profits arising from them, or for his own benefit to dispose of the title to the slave to another. Does the relationship of the executor to the estate of his testator, give him this right? It is believed that it does not. Upon the death of a testator, the legatees under his will become *sub modo cestui que trusts* of their respective legacies: if the estate is free from debt, an equitable title vests, which becomes perfect in law, by the assent of the executor. If any portion of the estate is undisposed of by the will, it vests in the heirs or distributees designated by law, and *quoad hoc*, they are the owners. So, that the mere authority to execute a will does not confer the ownership of property, but this continues with the testator while living, and after his death (if not required to pay debts) vests in his legatees or distributees. And there is an obvious propriety in withholding from an executor the right to emancipate slaves----at least, without investing him with the discretion over the subject, which the owner himself possesses. If it is competent to delegate the power to act under the statute of eighteen hundred and thirty-four, to an executor, he might be constrained to perfect the emancipation, so far as it depended upon his agency, without being permitted to regard any after developments in the characters of the slaves, however unworthy these might shew them to be of the boon of freedom; and which, had they been anticipated by the owner, would have induced its denial. The owner has

a control over the statutory proceeding, and may withdraw it at any time before consummation of the act, and retain his slaves in servitude.

Again: In some of the States, their legislatures have refused to allow the manumission of slaves, by will—for the reason, that wills are usually made during the last illness of the testator, when influences often act upon the mind, calculated to cause a disposition of property, which sober reason could not approve. And who can say that this consideration weighed nothing with the General Assembly in thus limiting, in its terms, the act of eighteen hundred and thirty-four.

To recapitulate:—we have said, that the Constitution, by investing the General Assembly with the power "to pass laws to permit the owners of slaves to emancipate them," has impliedly, abrogated all pre-existing modes of emancipation, and is, consequently, a negation of the right, save only in the manner, and to the extent, the legislature may proscribe. The legislature having signified its pleasure that the owner shall institute and consummate a proceeding, having that object in view, there is a want of authority to confer freedom by will, either absolutely or upon condition, for the reason that it is not a compliance with the legislative direction.

Let us now inquire whether this conclusion is in harmony with judicial decision. In *Haywood vs Craven's ex'ors.** it appeared that the testator, among other bequests, by his will, gave and bequeathed to his sister, thirty slaves, and after her death, gave and bequeathed twenty-nine of these slaves and their increase to his executors, the survivor of them, and the executors of the survivor, *in trust*, to have them set free by the laws of the State, in such time and in such manner as they might think proper. The testator died, his sister was put into the possession of the property, and by her will bequeathed the same to the plaintiff. The bill prayed that the defen-

---

*2 Caro. Law Rep. 557.

dants might be decreed trustees for the benefit of the plaintiff and compelled to deliver unto them the slaves, &c. Among other arguments against the plaintiff's right to recover, it was urged, that the testator having empowered other persons to dispose of his estate, the heir at law was disinherited as much as if he had disposed of it himself, so that there could be no resulting trust. And further, as the testator had asked for nothing to be done, but in pursuance of law, it was possible that the slaves might yet be emancipated by the legislature; or the executors might procure their emancipation by sending them to some other State. They should be allowed full time to make every proper effort to obey the will of their testator, and the discretion of the court could not be more wisely exercised than by holding up the bill 'till this was done. For the plaintiffs it was answered, that equity adopts the same rules for the transmission of estates, that have been laid down by courts of law, and puts the same construction upon trusts, that a court of law does upon legal estates; and where a case is sent from the former to the latter, for its opinion, it must be stripped of all appearance of a trust, otherwise no answer will be given.* It is essential to every gift, that there should be a *donor*, a *donee*, and a *thing* given; the donee must have capacity to take and hold: where he has neither, the conveyance of whatever sort, is absolutely void. Again: If a devisee has not capacity to take when the estate ought to vest, the devise is void. In the case of a descent, a person not *in esse* may take when he comes *in esse*——A slave cannot hold property, and the holding it for him, whether by trust or otherwise, is illegal. And lastly, a statute of North Carolina points out the manner in which slaves shall be liberated and inhibits every other mode, which at once excludes the idea of a complete emancipation by will, or

---

*Burr. R. 1108-9; 2 Ves. jr. 426; 4 Ib. 788.

of a valid authority to emancipate; so that to carry the trust into effect would be, but to set the slaves free, contrary to law. The court declared the opinion, that the trust attempted to be created by the will of the defendant's testator is void in law, not only as contrary to its general policy, but as repugnant to positive provisions by statute; the law having pointed out but one method in which slaves could be liberated, and the principle on which it is allowed,—it could not, by construction, be applied to that case in which a different course was pursued. The pertinency of this, to the case at bar, will best appear by a reference to the statute on which the court founded its judgment. The preamble to the act recites: "Whereas the evil and pernicious practice of freeing slaves in this State, ought at this alarming and critical time, to be guarded against by every friend and well wisher to his country," it is enacted, "That no negro or mulatto slave, shall hereafter be set free except for meritorious services, to be adjudged of and allowed by the County court, and a license first had and obtained thereupon." And if any slave is set free otherwise than the act directs, it is made lawful for any freeholder in the State to take him and deliver him to the sheriff of the county, who is required fo commit him to jail, to remain until the next County court, when an order shall be made to sell all slaves thus confined, to the highest bidder; and the sheriff is directed to give at least five days notice to the last owner, &c. This statute declares the policy of that State to be adverse to the emancipation of slaves, and authorises the apprehension and sale by the sheriff, (unless claimed by his last owner, &c.) of any slave set at liberty otherwise than it provides. Our statute does not expressly declare the policy of the State on this subject, but our constitution is an exclusion of any other mode of emancipation, than the legislature have enacted, and operates with as much force as if express negative terms were embraced in the act itself.

6p                    38

The case of *Haywood vs Craven's executors*, is then, an authority directly in point, to shcw that it is not allowable absolutely to emancipate slaves by will, nor to impart to trustees an authority by such means to adopt measures contemplating the performance *of that act.*—(To S. P. *Vide Wright & Scales vs Lowe's ex'ors.*\*)

In South Carolina, the statute inhibits emancipation, in any other way than by *deed*, executed by the owner, in a prescribed form, at least a certain time before his death. The court of Chancery of that State, determined that a bequest of slaves to a trustee, with directions to set them free according to law, was an attempt to evade the law, and could not be supported. *Walker's ex'ors vs Bostick & Walker.*† See also *Hamilton vs Cragg,*‡ where the same principle is maintained in expounding a statute of Maryland, upon the same subject.

In Kentucky, the legislature have prescribed a mode for the emancipation of slaves, without restricting the right by the employment of negative words.§ Lut in the constitution of that State, we find this injunction: "They" (the general assembly) "shall pass laws to permit the owners of slaves to emancipate them, saving the rights of creditors and preventing them from becoming a charge to any county in this commonwealth"‖ Its Supreme court, in considering an application for freedom, held, that to effect the emancipation of slaves, the requisitions of the statute must be complied with—*Talbot vs David.*¶ Here is a case strikingly analogous in principle, to the one before us—like our act, that of Kentucky speaks affirmatively, while we have borrowed an almost literal copy of its constitutional provision.

But we have been referred by the plaintiff to the case of *McCutchen, et. al. vs Marshall,*\*\* as fully maintaining

---

\* 2 Murph. R. 354.                    † 4 Dess. R. 266.
‡ 6 Harr. & J. 16—and 2 Har. & McH. 199.
§ Laws of Ken. Morehead & Brown's ed. 1st vol. 608.
‖ Art. 7, s. 1.          ¶ 2 Marsh. R. 608, To S. P. 2 Bibb's R. 57.
\*\* 8 Peters' R. 220.

the authority of the master to emancipate his slaves by will. That case arose in Tennessee, and was of course subject to its laws. The testator, (Patrick M'Cutchen,) among other bequests, proceeds as follows: "I give and bequeath to my beloved wife Hannah, during her natural life, the tract of land on which I now live, together with all its appurtenances, and the residue of the slaves; the slaves to be subject to an arrangement, to be made in a subsequent article of this testament."

In a subsequent part of the will, he directs the slaves to be set free after the death of his wife, to whom he had given them for life.

Against the validity of the bequest of freedem, it was argued, that the laws of Tennessee did not authorise emancipation by will, but only authorised it for meritorious services, to be judged of by the County court—that they prescribed the method of proceeding where manumission was proposed; and provided for the sale of the slave, where the master attempts to free him, without complying with the directions of the law. Further— that by the testator's death, the property in the slaves passed to another; so that it was incompetent for the public, through its organ, the County court, to give an assent to their manumission, on the application of a trustee, designated by the testator. To this argument, it was answered, that the laws of Tennessee did not prohibit the emancipation of slaves, by will, and that the executors were authorised to observe the directions of the will, if the assent of the State, through its appointed organ, could be obtained—and that the next of kin have no vested rights to be affected by such act. A contrary argument could only be supported, upon the ground, that there is a positive law, inhibiting any other mode of emancipation, than that expressly pointed out. That the restrictions upon that right, contained in an earlier enactment, and the authority to sell slaves, not manumitted, according to its directions, had been repealed by a a later law, and general powers given to the County court upon the subject. The court, in its opinion, say,

that the act of North-Carolina, of seventeen hundred and seventy-seven, which was in force in Tennessee, has been modified, by a statute of the latter State, passed in eighteen hundred and one—as far as it relates to its restrictive terms: so that, no positive inhibition was imposed upon other methods of manumission, not provided for by it. Besides, the question, whether an executor shall be authorised to consummate the freedom of slaves, by an application to the County court, or that tribunal be authorised to entertain such a proceeding, was determined by the Supreme Court of Tennessee, in the case of *Hope vs Johnson*, in the affirmative. The opinion in that case was regarded as a judicial interpretation, by the highest court in the State, of one of its own statutes, which not having been called in question, in its own tribunals, was regarded as conclusive.

In the case of *Hope vs. Johnson*,* the Court say—"As between the master and the slave, the intent and volition of the master to emancipate may be made known by any species of instrument that will completely evince it; and then nothing more is wanted but the assent of the State, expressed by its organ, the court—which may shew its determination, by reporting on the petition, and certifying the same; and by causing both the petition and the report to be filed among the records of the court. The mind and desire of the owner may be as well expressed by will, as by deed, or any other instrument; and when it is made known by his will, the duty of his executor is to use such legal means as may be effectual for the completion of his purpose."—— See also, *McCutchen vs Price*.†

The judgment in the case of *McCutchen, et al. vs Marshall*, is professedly founded upon the decision of *Hope vs Johnson*, and that case upon an affirmative statute, uncontrolled by a constitutional provision, such as ours, and does not at all conflict with the conclusions we

---

* 2 Yerger's R. 123.                    † 3 Hayw. R. 212.

have expressed. So, that however obnoxious we consider it to legal criticism, we forbear to remark further upon it, as it does not lie in our way.

In *Pleasants vs Pleasants*,\* the heir and executor of John Pleasants, and the executor of Jonathan Pleasants filed his bill in Chancery, in which it is substantially alleged, that the respective testators bequeathed the slaves in question, to legatees, named in their wills, upon condition that they should be emancipated when they attained a certain age, and the laws would permit,----that some of them had attained the age appointed by the will, and the laws now anthorised their freedom. The plaintiff claimed title for a breach of the condition, or as an executor, to perform the directions of the wills, and had applied to the defendants to emancipate the slaves, which they refused to do. The bill prays that the slaves may be delivered up, to be holden in trust, for the purposes of the wills of the testators, and that the court would direct the manner of their emancipation, and for general relief. The allegations of the bill were not materially denied by the answers. So that the cause was examined mainly upon the questions of law arising upon the bill itself. The judges delivered their opinions *seriatim*, in which, conceding it to be a nice question, whether the negroes are entitled to freedom, the adjudge the following points: First—That in Virginia, up to the year seventeen hundred and forty-eight, the owner of a slave was allowed to emancipate him, upon the principle, that every one had a right to dispose of his own property, as he pleased; but, in that year, a law was enacted, to prevent the manumission of slaves, except for meritorious services, to be judged of by the executive. This law remained unaltered until seventeen hundred and eighty-two, when the act passed to tolerate emancipation, upon condition that an indemnity should be given to the public, against loss and ex-

---

\* 2 Call's R. 270.

pense.   Second—Though the emancipation provided for by the will was unqualified, without any act to be done by the legatees or trustees; yet the act contemplated by the testator had substantially taken place, by the passage of the statute of seventeen hundred and eighty-two.   Third—The negroes were not legally emancipated, under the wills, and the act of seventeen hundred and eighty-two, enacted subsequently to the testators' deaths; but they should be liberated, on the ground of a a trust created by the wills, the performance of which that statute made permissible.   Fourth—The testators' power to emancipate, was restricted by the act of seventeen hundred and forty-eight, and had the slaves been bequeathed on condition that the legatees should immediately manumit, such condition would have been void, and the property vested; yet a condition, the performance of which was to be postponed, until authorised by law, was not of that sort.   Fifth—The limitation in favor of the slaves, if to be tested by the rules applying to the remainder of a chattel, upon a contingent event, would be too remote, and therefore void ; but considering the character of the property, these rules should not be applied.   Sixth—The construction of the wills must be, as it should have been, at the death of the respective testators.   *And lastly*—That an acceptance of the legacies, under the wills was an inchoate contract to emancipate the slaves, which was essentially made complete, by the passage of the act of seventeen hundred and eighty two.   But, in as much as the testators did not declare their minds, whether they would compel their legatees to manumit, on the terms imposed by that act, they can not be compelled to execute the requisite bonds; yet the executor, or any other person, may voluntarily give them —and the bonds thus given, would be quite as effectual to consummate freedom.

That this case does not, in the slightest degree, oppose the construction we have placed on our statute, must be apparent to any one who will carefully examine it.   The court assume it, as a point undeniable,

that the act of seventeen hundred and forty-eight, deprived the owner of the right to emancipate slaves by will, or to create a trust in that way, by which that object could be effected. This statute, so far as that question is concerned, is not materially variant from our own: it inhibits manumission, except for meritorious services, to be judged of by the executive;—ours, taken in connection with the constitution, tolerates this right, save only "in consideration of long, faithful and meritorious services performed, or for other good and sufficient cause shewn," of which the judge of the county court is to determine. So that under each law, the right of the owner is restricted, or to be exercised in obedience to the judgment and discretion of an officer designated for that purpose.

Not so with the Virginia statute of seventeen hundred and eighty-two,—that act permits "*an unlimited emancipation*," but annexes "a condition, imposing upon the person liberating, certain terms, for the sake of the community, of which persons making a voluntary manumission might judge whether they would do the act upon these terms, and use their pleasure." The terms are, the execution of a bond, with approved securities, conditioned, that the slaves proposed to be freed, shall not become chargeable to the public.

The idea that this case fully sustains the plaintiff, is generated by a neglect to mark the striking dissimilarity between the law of seventeen hundred and eighty-two, and that of our own State. The one intrusts every thing to the mere pleasure of the owner, while the other invests a tribunal designated for that purpose, with a right, uncontrolable, (save only by the legislature,) of determining upon the owner's mere petition. And this difference in the legislation of the two States deprives the decision we are remarking upon, of all force, when sought to be applied to the case at bar—for had the act of seventeen hundred and forty-eight, have continued unchanged by that of seventeen hundred and eighty-two, it never would have been supposed that the

slaves were entitled to freedom under the wills of the testators : in fact, any such pretence, is directly opposed, as well in the argument of counsel, as in the opinions of the judges.

In that case, it is adjudged as a legal principle, that a legacy given by words, *in præsenti*, which cannot vest at the testator's death, because of its unlawfulness, or the incapacity of the legatee, is void.   Now if the desire and will of the testator, that his slaves shall be free, be considered in the light of a bequest to them alone, it cannot be maintained; for the will does not ascertain a future period, when they shall be allowed the enjoyment of this boon, and according to legal interpretation, it must vest, if at all, immediately upon the testator's death.   It is utterly impossible for such a bequest then to take effect: the assent of the judge of the County court must first be sought and obtained, and this assent, it is more than possible, could not be had ; so that, being necessarily deferred to a future contingent period, the will, *pro tanto*, is void, and the property in the slaves must pass to the legal distributees.*

We have felt it proper to consider, thus at length, the case of *Pleasants vs. Pleasants*, because it was mainly relied on by the plaintiff, as sustaining his testator's will. We do not think it necessary to examine its legal accuracy, as it does not oppose any conclusion of ours ;—if it did, it is more than possible, we should, with all our respect for the Judges who determined it, be tempted to question the correctness of some of the positions they maintain.

It has been argued further for the plaintiff, that though the bequest, in favor of the slaves, may not come within the equity of eighteen hundred and thirty-four, yet it may be regarded as a trust imposed upon the executor, and of consequence, upon the administrator, *cum testamento an-nexo*—the performance of which may be permitted by (if

---

* To S. P. vide 2 Ves. jr. 282—1 Roper on Leg. 44, 319—Plow. 345—Cro. Eliz. 422—9 Mod. 167—181—1 Strange, 369—1 Salk. 227.

not enforced against) the executor, by a removal of the negroes to some other State, where they may enjoy their freedom; that the terms of the will shew, that such a performance was not beyond the contemplation of the testator. To this argument, it may be answered, that the only means known to our law, of imparting liberty to slaves, is either that provided by the act of eighteen hundred and thirty-four, or the special permission of the legislature; that the will does not contemplate their removal to acquire, but to enjoy freedom, which it sup oses to be conferred by virtue of the declared wishes of the testator, and consequently no such trust is either expressly or impliedly created by the will, as the argument assumes. But let the premises be conce led, and how stands the case? A divestiture of title is not sought by the application of our laws, within whose jurisdiction the slaves are, but by the force of other laws, within whose influence the Court is asked to have them taken. It cannot be, that our tribunals should deny them freedom, and yet coerce or approve their removal to another government, for the undisguised purpose of effecting that end. And may it not well be doubted whether the performance of the trust supposed, would not oppose the policy of our law? Besides, does not the property of a testator, if within the State, and not legally disposed of, at the time of his death, vest in his personal representatives or distributees, so that it cannot be divested by the power of the judiciary?— These questions need not be answered, for it has been already shewn, that the argument is not defensible.

Again:—Equity subjects trusts to the same construction that a court of law does legal estates. And a *donee* must have capacity to take, whether it is attempted to convey title directly to the party himself, or to another in trust for him.* Here, the plaintiff insists, that the administrator, *cum testamento annexo*, is made a trustee by the will, to execute its directions: so far as it relates to the be-

* 2 Atk. 806—2 Ves. jr. 482.

quest of freedom, the slaves themselves must be the *ces-tui que trusts*. Does not their incapacity forbid this? If it does, would not such a trust fail, because there was no one competent to claim its benefit?*

We are of opinion, from a view of the entire case, that the slaves intended to be manumitted by the will of the testator, are not entitled to freedom. The decree of the Circuit court is therefore reversed; and the slaves must be held subject to distribution, according to the laws of this State, as in cases of intestacy—the testator not having made any other disposition of the void or lapsed legacies, bequeathed by his will. And as there are sufficient reasons for believing that the plaintiff's bill was exhibited, *bona fide*, for the purpose of obtaining the directions of the court, in the execution of the will, the costs of this court, as well as of the Circuit court, should be paid out of the estate of the testator, in plaintiff's hands to be administered.

The bequest of plantation utensils, kitchen furniture. &c. being made in anticipation of the freedom of the slaves, must of course fail, for the reasons stated,—and a decree will be entered accordingly.

---

*4 Dess. R. 266—Cam. & Nor. R. 353.