PURVIS AND OTHERS v. J. L. SHERROD, Ex'OR.

The District Court has jurisdiction of an action by an executor, against the heirs, devises and legatees of the testator, to procure a construction of the will, and instructions as to the proper execution of the same.

A bequest of slaves upon trust that they shall be carried to a free State or to the Colony of Liberia where they may enjoy their freedom, is not void at Common Law because of the incapacity of the beneficiaries to take at the testator's decease.

Where a right exists at Common Law, and the Constitution contains a provision that the Legislature shall have power to permit the exercise of that right under certain regulations and restrictions, the Common Law right is not affected until the Legislature acts; it is otherwise where the right did not exist at Common Law.

Although the clause in the State Constitution respecting the emancipation of slaves, would not when taken by itself, amount to any restriction on the right of emancipation, yet when it is taken in connection with the Constitution of the Republic, which expressly required that the slaves be sent without the limits of the Republic, and with the Act of the Republic, which is still in force, prohibiting free negroes from coming into or remaining in the State, it must be construed to impose the restriction, that the party who desires to emancipate his slave, shall cause him to be sent without the limits of the State.

Although the State, by its laws, may absolutely prohibit emancipation or direct the particular mode in which only it can be done, yet a bequest of freedom, not to be perfected until the slave is removed beyond the territorial limits of such State, is nevertheless a valid bequest.

A bequest to a slave to take effect after his removal from the State and emancipation, where the removal and emancipation are provided for in the will, is valid.

Suit was brought by the executor of a will for a construction of two clauses of the will, and for instruction as to the proper execution of the same, to wit: "3. I " give to my negro woman, Charlott, and her child Julian, their freedom, be- "cause of Charlott's faithful services, in aiding me to make all the property " which I own in the world. I also give my boy, George Washington, his free-

" dom, because of affectionate regard for him.  And I wish the above three ne-
" groes to be left under the charge of my sister, Lucinda Sherrod, to be settled
" near her and under her charge; and if the State of Texas, or any of my rela-
" tions, should object to their freedom on these conditions, I give my sister full
" power to send them to a free State, or to Liberia, as she and the negroes them—
" selves may agree."  " 4. I give my negro woman, Charlott, my horse Charley,
" two cows and calves, one plough and gear and meat for one year, and I give $300
" to enable her to fix her comfortably.  In case this will should be contested by
" any of my legal heirs, then in that case, I give the above three negroes, Char-
" lott, Julian and George Washingion, to my sister Lucinda Sherrod, believing
" she will carry out my will in the premises; and I further bequeath to my sis-
" ter, Lucinda, sixteen hundred dollars, in case this will should be contested by
" any of my legal heirs, for the purpose of carrying out my will."  Plea to the
jurisdiction and demurrer.  The plea and demurrer were both overruled, and
the Court decreed that the State did object to the freedom of the negroes on the
conditions mentioned in the will; and that the plea and demurrer contested the
will; that Charlott was not entitled to the bequest of the $300, &c., and that
Mrs. Sherrod was entitled to receive the negroes, and the $1600 as special trustee
for the emancipation of the negroes ; that they should be sent to a free State or
Liberia, as she and they might agree ; and that after paying the expenses of
their transportation, they were entitled to the remainder of the $1600.  The de-
cree gave some directions as to the manner in which Mrs. Sherrod should execute
the trust, and ordered, that if she failed to do it, it should be done in the same
manner by the executor.—Held, there was no error in the decree.

Error from Harrison.  This suit was brought by the de-
fendant in error, the executor of the will of William T. Weath-
ersby, deceased, in the District Court of Harrison county, for
a construction of two clauses of the will, and for instruction
as to the proper execution of the same, to wit:  " 3rd. I give
" to my negro woman Charlott and her child Julian their free-
" dom, because of Charlott's faithful services in aiding me to
" make all the property which I own in the world.  I also
" give my boy George Washington his freedom, because of
" affectionate regard for him.  And I wish the above three
" negroes to be left under the charge of my sister Lucinda
" Sherrod, to be settled near her and under her charge ; and
" if the State of Texas, or any of my relations, should object
" to their freedom on these conditions, I give my sister full
" power to send them to a free State, or to Liberia, as she and
" the negroes may agree."  " 4th. I give my negro woman

" Charlott, my horse Charley, two cows and calves, one plough
" and gear, and meat for one year, and I give three hundred
" dollars to enable her to fix her comfortably. In case this
" will should be contested by any of my legal heirs, then in
" that case, I give the above three negroes, Charlott, Julian
" and George Washington, to my sister Lucinda Sherrod, be-
" lieving she will carry out my will in the premises. And I
" further bequeath to my sister Lucinda, sixteen hundred dol-
" lars, in case this will should be contested by any of my legal
" heirs, for the purpose of carrying out my will."

Purvis and wife pleaded to the jurisdiction, and demurred ;
and the other defendants made default.

The plea and demurrer were both overruled ; and the Court
decreed that the State did object to the freedom of the ne-
groes, on the conditions mentioned in the will ; and that Pur-
vis and wife, by their plea and demurrer, did contest the will ;
that Charlott was not entitled to the bequest of three hundred
dollars, &c. ; and that Mrs. Sherrod was entitled to receive
the negroes and the sixteen hundred dollars, as special trus-
tee, for the emancipation of the negroes ; and that they should
be sent to a free State, or Liberia, as she and they might
agree ; and, after paying the expenses of their transportation,
they were entitled to the remainder of the sixteen hundred dol-
lars. The decree gives some directions as to the manner in
which Mrs. Sherrod shall execute the trust ; and orders that
if she should fail to do it, it should be done in the same manner
by the executor. To reverse this decree, the writ of error is
prosecuted by Purvis and wife.

*Wigfall*, for plaintiffs in error. I. Authority to the Legis-
lature to create a Probate Court " for the transaction of busi-
ness appertaining to estates," is given by the 15th Section
IV Article (p. 64) Constitution of the State. The same Sec-
tion authorizes the Legislature to prescribe and regulate the
original and appellate powers of the District Court as to pro-
bate matters. It is to be vested with these powers " under

such regulations as may be prescribed by law." We must look, therefore, to the Acts of the Legislature, and not to the Constitution for the distribution of these powers. The Legislature, acting upon the authority of the 15th Section, IV Article, Constitution, on the 11th day of May, 1846, declare and prescribe the cases in which that Court should exercise original, and in what, appellate jurisdiction. (Hart. Dig. Art. 642.) "The District Courts shall have and exercise appellate "jurisdiction and general control over the Probate Courts, and "original jurisdiction in probate matters only in cases where "the Judge or Clerk of Probate is interested."

The Act of 1848 extends the original jurisdiction of the Court to another case. (Hart. Dig. Art. 1112.) It is provided, that "any person interested in any such will, may, within "four years after it is admitted to probate, institute suit in "the District Court to contest its validity." It is further provided in the same Section, that it may be "attacked" for fraud or forgery, within four years after the discovering of the fraud or forgery, in a suit "by any heir at law or any other person interested in the estate" of the testator.

It is not pretended that the Judge or Clerk of Probate is interested in this suit, and it can hardly be seriously urged that this is a proceeding to contest the validity of the will, or to attack it for fraud or forgery "by an heir at law, or other person interested in the estate." The executor, whilst pretending to be simply asking for a construction, is resisting all attacks, seeking to establish its validity, urging that its provisions are legal, and praying that he may be permitted to carry them into execution. An odd sort of attack that. For these reasons it is submitted that the District Court has no original jurisdiction in a case like the present.

But it is insisted on, that the Probate Court cannot construe the legal effect of a will, because it is said, no such power is given by the statute. (Hart. Dig. Art. 1206.) "The Court "shall proceed to ascertain who are the persons, by law, entitled "to partition and distribution, and their respective shares; and

" shall also ascertain what estate is liable to partition and dis-
" tribution." ·How can the Court ascertain who are " by law"
entitled to distribution, without construing the will ? or how
construe the will, without deciding its legal effect ?   The only
questions involved in this case, are, first :  Are the slaves
named in the will, " entitled by law, to partition and distri-
bution ?"   Secondly :  Do they constitute a part of " the estate
liable to partition and distribution ?"

These questions the Probate Court should have decided, and
left any parties not satisfied with the decision to appeal.  (Hart.
Dig. Art. 1232.)

But the admitting the possible necessity of appeal, is claimed
by the defendant in error, as a surrender of the question.   It
is taken to be an admission of the incompetency of the Chief
Justice to declare the legal effect of a will, and, as a conse-
quence, of the original jurisdiction in the District Court of all
such questions.   An appeal lies from the District, to the Su-
preme Court, in all cases ; therefore the District Judges are
incompetent to decide any cases, and the Supreme Court has
original jurisdiction in all cases.   The Probate Judges are
assumed to be uniformly ignorant, and their assumed ignorance
is relied on, to exclude the idea of the power to construe wills
being entrusted to them.   It is sufficient answer, to say, that
it is entrusted to them.

Original jurisdiction in the District Court, upon this ques-
tion, is claimed under its general chancery powers.   A dis-
tinction is attempted to be drawn by the counsel for the de-
fendant in error, between the power in a Court of construing
ambiguities in a will, and declaring its legal effect.   The
former power he admits to be in the Probate Court of neces-
sity ; but insists that the latter belongs exclusively to a Court
of Chancery.   The cases he cites to establish these principles,
show that it is precisely the power he claims for a Court of
Chancery, that it does not possess, and that it only exercises
those which he admits to be in the Probate Court.   On this
subject see also Mitf. Plead., p. 123, notes f & 1, and p. 152

(marginal paging;) also Spence's Eq. Juris. p. 625 (marginal paging.)

A Court of Equity will aid an executor in construing a will, that is, in interpreting clauses which are vague, and of doubtful meaning; but it cannot, at the request of the executor, declare as to the validity of a will, or pronounce upon the legality of its devises and bequests. But be this as it may, our Constitution and laws have distributed the judicial powers among the different Courts in this State, and the power under consideration is vested in the Probate Court, and the exercise of it prohibited to the District Court by statute.

It is submitted that the plea to the jurisdiction should have been sustained, and that the Court erred in overruling it.

II. The next question arises upon the demurrer. Can slaves be freed in this State by will, and are they capable of taking a bequest? The 8th Article of the Constitution of this State is copied from the Constitution of Alabama (See Constitution Alabama, Title SLAVES.) From the time of the adoption of that Constitution, 1819, till 1834, the Legislature of that State, like our own, passed no law upon the subject of emancipation; yet, during that time, no slave was ever freed, except by special Act of the Legislature. (See Trotter, Adm'r v. Blocker and Wife, et al., 6 Porter R. 296.) Here then is continuous and contemporaneous construction of the clause of our Constitution, by the political power of the State from which it is taken, for a period of fifteen years. *Contemporanea expositio potissima est in lege.*

In 1830, the Supreme Court of Alabama, in the case of Isabel et al. v. Stamp's Ex'or, decided that under that clause in the Constitution, in the absence of any legislative action on the subject, a slave could not be freed by will—that it could only be done by an Act of the Legislature. (6 Port. R. 293.) In 1838, the case of Trotter, Adm'r v. Blocker and Wife et al., was decided; and the case of Isabel et al. v. Stamp's Ex'or, was affirmed. The case of Trotter v. Blocker decides that " the first Article of the Constitution of Alabama in rela-
10

"tion to slaves, is equivalent to a positive inhibition of the "right of the owner to emancipate slaves, except only, and "under such regulations, as the Legislature may prescribe."

When, then, this Article in 1845, was transferred from the Alabama Constitution to ours, it had received both the political and judicial construction, of the State from which it was borrowed. It was adopted with that construction. With that construction we took it, and by that construction we must abide. It is too late now to consider its correctness. The cases relied on by the defendant in error were all of them decided in States that had no similar constitutional provision.

As to the bequests to the slaves, see 1 Bail. 642, Lenoir v. Sylvester. "A legacy cannot be given to a slave. He is, "in law, himself a chattel personal, and it would be absurd "to say that property can own property." Same principle in Trotter, Adm'r v. Blocker *et al.*

There can be no trust created in favor of a slave. His condition forbids his being a *cestui que trust*. Equity subjects trusts to the same construction that a Court of law does legal estates, and a donee must have capacity to take, whether it is attempted to convey the title directly to the party himself, or to another in trust for him. (See Porter, 296; Burr. R. 1108, 1109; 2 Ves. Jr., and 4 Ves. Jr. 788.)

Where slaves cannot be freed in a State by will, the executor cannot take them out of the jurisdiction to free them. "Property of a testator, if within the State, and not legally "disposed of at the time of his death, vests in his personal "representatives or distributees, so that it cannot be divested "by the power of the judiciary." (6 Porter, 305, 294; see also Hart. Dig. Art. 1221.) "When a person dies, leaving "a lawful will, all his estate devised, or bequeathed by such "will, shall vest immediately in the devisees, or legatees, and "all the estate of such person not devised, or bequeathed, "shall vest immediately in his heirs at law."

It is insisted that the case of Fisher and Dobbs is not in point, because, in Tennessee, the discretion, as to emancipa-

tion, is vested in the judicial department of the State, and that here it is not. Precisely for this reason, I think, that though there the Court might interpose, and carry out the intention of the testator, as expressed in his will, that, here, the Court cannot. Our Constitution, by vesting this discretion in the Legislature, has forbidden its exercise to all the other departments of the government, and to every individual citizen of the State. It was wisely vested in the Legislature. The provision in the Constitution shows that it was considered as against public policy by the convention ; but *tempora mutantur et nos mutamur cum illis.* The Legislature being biennially elected, and coming fresh from the people, could, at any time, relax the rule, if in the opinions of the people it should become just, proper, and expedient.

It is submitted that the demurrer should have been sustained and the bill dismissed.

*C. A. Frazer*, for defendant in error. I. A contest between the heirs at law and the beneficiaries under the will for the estate, is a contest of title—one claiming under the statute of descent and distribution, and the other under the will. This controversy may demand all the energy and facilities afforded by the jurisdiction of a Court of Chancery, with power to submit issues of fact to the severe test of jury trial—issues which no prudent Chancellor would take the responsibility to determine, had he the power. Yet the principles contended for on the other side, would require the submission of grave questions of law and complicated issues of fact to the decision of the Chief Justice of the County Court, when that officer may be, and often is, one of the most illiterate men in the community. The framers of our Constitution, and the Legislature, never intended such a result. It may be said that the decision, if erroneous, may be revised in the District Court. But this is begging the question ; for it admits the incompetency of the Court to decide the issues that may arise, and renders the County Court a mere forum to

make up those issues, to be determined in a Court which is competent to decide them; from whose judgment there may be an appeal to this Court.  Such a mode of procedure, with all its incidental delays, hardship, and expense, is a judicial mockery which was not intended to be, and indeed was not, imposed upon the country by those who apportioned out to the various Courts the judicial power of the State, and laid the ground work of our system of jurisprudence, which is so highly distinguished, above all others, for the simplicity and direct-ness of its remedies.

Now, the question arises, can the will of William T. Weth-ersby, as to the negroes, Charlott, Julian, and George Wash-ington, be executed without a decree upon that instrument—not changing his intention or his will, but extending to the executor facilities for its execution which are not furnished by the will itself.  The intention of the testator is manifest in every allusion of the will to the negroes, that they shall be free; but if they take possession of their freedom from a de-cree of the County Court, they must receive it with the terms and conditions which that Court may impress upon it; and if the Court decreed them entitled to their freedom, as in the first instance directed in the will, then all it could do would be to order them to settle near Mrs. Sherrod and under her control, without the power to place such restraints upon that control, as to harmonize its exercise by her with the enjoyment of freedom by them; and unless this harmony had a compulsory existence, and was incapable of destruction, their freedom would be but a name, while their condition would be involun-tary.  But suppose the County Court should undertake to direct their freedom, as indicated in the second instance in the will.  It could do no more than follow the terms of the will, and decree to Mrs. Sherrod the negroes and the sixteen hundred dollars, without imposing upon her the trust to emancipate them; and the negroes and the money would, under such a decree, be her absolute property; and to them, their freedom would be but the exchange of a master for a

mistress. It is evident that a Court of a more enlarged juris-
diction, and administering remedies more ample and com-
plete, must render the decree controlling the execution of
Wethersby's will as to the freedom of those negroes; and that
Court is the District Court,—it has the jurisdiction. The
10th Section of Art. 4 of the Constitution provides, among
other things, that "the District Court shall have original
jurisdiction of all suits, complaints, and pleas whatever, with-
out regard to any distinction between law and equity, when
the matter in controversy shall be valued at, or amount to one
hundred dollars, exclusive of interest;" The 15th Section of
the same Art. provides that the "District Courts" shall have
"original jurisdiction and control over executors, administra-
tors, guardians, and minors, under such regulations as may
be prescribed by law."

The only limitation placed upon the subject matter embraced
in the first of these grants of jurisdiction is, as to the amount
in controversy; and it must be admitted that it is broad
enough to include, and does include, every subject matter
valued at one hundred dollars, and over that amount, which
can be made the foundation of a suit, complaint, or plea, at
law or in equity; unless it is a subject matter that is carved
out of this general grant of jurisdiction, and placed within the
jurisdiction conferred upon some other Court by the Constitu-
tion, and made exclusively cognizable there. But such is not
the fact as to the subject matter of this suit; for the emanci-
pation of slaves is a subject not placed within the jurisdiction
of any of the inferior Courts, nor is the power to declare the
legal effect of wills.—Hence the jurisdiction of the District
Court over the subject matter of this suit, is conferred by that
general grant of the Constitution.—The jurisdiction over the
person of the plaintiff, in his capacity of executor, is expressly
conferred; and no argument is necessary to show it. But the
statute leaves no doubt. It enacts that "any person interested
in any such will may, within four years after it is admitted to
probate, institute suit in the District Court to contest its vali-
dity." (Hart. Dig., Art. 1112.)

Now, if Purvis and wife had been plaintiffs in this suit, instead of Sherrod, the executor, alleging that the negroes sought to be emancipated by the will were not entitled to their freedom under the law, and that the provisions of the will for their benefit, were void, there could be no doubt as to the jurisdiction to entertain the suit and decide the question; but how can reversing the parties defeat the jurisdiction? The question is identically the same, by whomsoever it may be submitted. Jurisdiction over the subject matter does not ebb and flow with the change of parties on the record. When once vested, it continues, whether in exercise or at repose in the bosom of the Court, until withdrawn by a repeal of the statute, or alteration of the Constitution by which it was conferred.

The language of the statute is, that any person interested in any such will, may, within four years after it is admitted to probate, institute suit in the District Court to contest its validity. Now, an executor is interested in a will. He has a direct legal interest in the instrument itself. It is his title to the trust created by it, and to his commissions and other compensation for the discharge of that trust. And his interest extends to all the trusts of the will, and it is his right and duty to execute all of them; and for this purpose he may institute suit to contest those parts of the instrument which from obscurity, ambiguity, or the awkwardness of their structure, embarrass or render difficult the execution of the trusts of the will, when it can be done without changing the intention of the testator. Or if the will create a trust which is absolutely illegal, or the law forbids its execution, he may file his suit for a declaration of its legal effect, to relieve his conscience from the conflict of the law and his oath; for he is in effect sworn to execute the will,—the whole will; and until there is a judgment annulling those parts which are against law, he is bound to execute them, though he do it at his peril. But a timely application to the chancery powers of the District Court will afford him relief from this responsibility, by ex-

'tending to him, in the language of the Supreme Court of New Jersey, " counsel, indemnity and protection. ( 6 Green, Ch. R. 330.)

The chancery powers of our District Court are as ample and complete as those of Courts of Equity in England and the American States where the two jurisdictions are separate; and trusts are the favored objects of the chancery jurisdiction, wherever the principles of equity are administered. Upon these principles, an executor, as a trustee, may file a bill against all the parties interested, for a decree to settle their rights, and for a construction of the will, where a doubt exists as to its legal effect. The case of Constantine vs. Constantine (6 Ves., p. 100,) is in point. There the executors filed a bill for a construction of the will, and to settle the rights of the parties in personal property, under an obscure clause of the will; and notwithstanding the ample jurisdiction of the Ecclesiastical Court to administer personal property, the court entertained the suit, and rendered a decree settling the rights of the parties, and construing the will.

In the case of Freeman vs. Cook, (6 Ired. Eq., p. 373,) the defendant, who was a trustee, answered, among other things, that counsel doubted if the settlement (the foundation of the suit) was not void ; and upon this point the Supreme Court use this strong language: " It was very important to the de-" fendants, not only to have good advice, but such as would " sustain or remove the doubts thus expressed, and protect " them in their action. What course then ought they to have " pursued ? Their only safe course was to have procured the " advice of a Court of Chancery, which they had a right to re-" sort to. (Willis on Trustees, p. 125 ; 2nd. Fon. Eq. p. 172, " note C.) The Chancellor is the only safe and secure counsel-" lor to trustees." The authority referred to in Fonblanque fully sustains this opinion, and if possible, it is more emphatic. It says " that a trustee may be correct in his apprehension of the law of the Court, and yet not be justified in taking upon himself to proceed upon it, without the sanction of the Court."

It appears from the case of Guilford vs. Guilford, (4 Ired. Ch. R. 168,) that the County Court of North Carolina has jurisdiction to order the payment of distributive shares; and pending a petition for the purpose in that Court, the executor filed his bill in the Court of Chancery of that State, for a construction of the will and a decree settling the rights of the parties. This circumstance renders the case of Guilford vs. Guilford a strong and conclusive authority; for our County Court has no greater jurisdiction than that of North Carolina. The decisions in that State afford numerous authorities for the application of an executor to a Court of Chancery, for a construction of the will and a decree settling the rights of the parties. (Phifer v. Phifer, 6 Ired. Ch. R. 155; Kirkpatrick v. Rogers, 6 Id., 130; Alexander v. Alexander, 6 Id., 229; Ward v. Sutton, 5 Id., 429; Eason v. Eason, 7 Id., 98; Cox v. Williams, 4 Id., 15; White v. University, 4 Id., 19; Hill v. Spruill, 4 Id., 244; Jones v. Oliver, 3 Id., 369.)

The same practice prevails in the courts of equity in Tennessee. (Bowman's Ex'rs v. Tucker, 3 Humph. R. 648; Seay's Adm'rs v. Winston et. al. 7 Id., 472.) The bill, in the latter case, was filed by an administrator with the will annexed, "praying a construction of the clauses of the will, and that instruction be given him how he shall execute the trusts of the will." The bill was sustained; and a decree rendered construing the will. The bill in the former was filed by the executor for the same purpose. The Supreme Court of New Jersey holds this doctrine. "Besides, the complainants in this case are executors, and this Court has always been liberal in extending to executors, when acting in good faith, counsel, indemnity and protection." (Ex'rs of Lozier v. Adm'rs Van Saun, 2 Green, Ch. R. 325, 330.)

It is submitted that the authorities cited establish, beyond question, the jurisdiction of the District Court over the subject matter of this suit, and the right of an executor to apply to it for a construction of the will under which he is acting, and for instructions how to execute the trusts created by it.

II. The judgment of the Court below is not erroneous:

As contemplated by Wethersby's will, the State of Texas does object to the freedom of the negroes, Charlott, Julian, and George Washington, on the conditions that they are to be settled near Mrs. Sherrod, who resides in Harrison County, and under her charge. This objection, as recited in the decree of the Court, is manifested by the policy of her laws.

The statue of May 11th, 1846, to prevent slaves from hiring their own time &c., in effect requires owners of slaves to keep them under their daily dominion and control; and it positively forbids the owner of a slave to permit him " to act or deal, as a free person, within this State." (Hart. Dig., Art. 2576.)

If the owner of a slave cannot permit him to act or deal, in the ordinary acceptation of the term, as a free person, within the State, he of course cannot grant him absolute freedom, to be enjoyed in the State, and turn him loose, without restraint, a free man, upon society and thereby render him a citizen.— This is too clear to require argument or authority. The decree, then, that the negroes were not entitled, to enjoy their freedom in the State, is correct.

The Court properly held that Purvis and wife, by their plea and demurrer, did contest Wethersby's will. The petition submitted, for a decree declaring their legal effect, the provisions of the will, by which the testator attempted to liberate the slaves from servitude. The demurrer put in issue the right of the negroes to the testator's bounty,—to their freedom under his will, and his power under the law, by testament, to emancipate them. The demurrer contested the provisions of the will, which attempted to secure freedom to the negroes, and the bequest of three hundred dollars &c., for their benefit. This contest resulted in the decree that the negroes could not remain in the State, and that they were not entitled, under the law, to the bequest of the will to them.

The objection of the State, to the negroes remaining after emancipation in the State, gives effect to the provision of the will directing Mrs. Sherrod to send them to a free State, or

Liberia.   And the contestation of the will by Purvis and
wife, gives effect to the bequest of the sixteen hundred dollars
to her, for the purpose of carrying out the will.   The true
construction of the will, thus affected, is this, that the negroes
are entitled to their freedom, that they shall be sent to a free
State or Liberia, and that for this purpose, Mrs. Sherrod is
entitled to the negroes and the bequest of sixteen hundred
dollars, and that they are entitled to the surplus after paying
their expenses.

The intention of the testator is to prevail in the construc-
tion of his will, if it can be ascertained from the language which
he has employed ; and the various provisions of the will must
be so construed as to uphold them all, and give effect to the
entire intention—the entire will—of the testator, if it can be
done without violence to his language.   This, as a rule of
construction, needs no authority to support it; but see the case
of Constantine v. Constantine, 6 Ves., p. 100.   (Malim v.
Keighley, 2 Ves., p. 333 ; Paul v. Compton. 8 Id., p. 375;
Dashwood v. Peyton, 18 Id., p. 27, principle on p. 41.   Har-
land v. Trigg, 1 Bro. Ch., p. 142 ; Pierson v. Gornett, 2 Id.,
p. 38, principle on p. 45.)

But Mrs. Sherrod having acquiesced in the decree declaring
her a trustee for the emancipation of the negroes, no one has a
right to complain against the trust, as long as she is satisfied.
Her title to the negroes, as against the plaintiffs in error, by
the express language of the will, is clear and conclusive ; and
they will not be heard to say that she takes them as her abso-
lute property, when she chooses to treat herself as a trustee for
the humane purpose of their emancipation.   There can be no
doubt that the sixteen hundred dollars is a trust fund.   The
language in which it is bequeathed fixes its character as such.
It is given to Mrs. Sherrod for the purpose of carrying out his
will.   This is an express declaration of a trust.   This being a
trust fund to carry out the testator's will, and a part of that
will being that the negroes should be fixed comfortably, there
can be no doubt he intended that they should have the surplus

of the sixteen hundred dollars, after defraying the expenses of their transportation. Their comfortable establishment is a part of his will, to be carried out.

Now, will the law sustain the trusts of the will for the emancipation of the negroes and their establishment, and permit them to be executed by Mrs. Sherrod ?

If Wethersby were living, it would be admitted that he could take the negroes to a free State or Liberia, and there renounce his dominion over them, and liberate them from servitude. (Blackmore v. Phill, 7 Yerg. R. 452.)

Wethersby had no forced heirs, and his creditors are provided for by the decree of the Court. There being no question as to forced heirs or creditors, Wethersby, under our statutes, had the free disposition of his property ; and therefore, his right by will, to direct that to be done in respect to his property after his death, which he in his lifetime could have done, is clear, and it was competent for him to bequeath them in trust, for their emancipation out of the State. (Cox v. Williams, 4 Ired. Ch. R. 16 ; Cameron v. Commissioners of Raleigh, 1 Id. 346 ; Thompson v. Newlin, 3 Id. 338 ; 1 Id. 440.)

The case of Thompson v. Newlin, was a bill in Equity, by the next of kin, against the legatee ; alleging that the testatrix, to avoid the law, had bequeathed the negroes to the defendant, to be held nominally as slaves, but that they were in fact to be free. The Court decided, that if such was the intention of the bequest, it did not convey the property, but was a secret trust for the benefit of the slaves, and as such the trust was void, and the complainant was entitled to recover ; but the Court decided, that if in truth, the trust was to send them out of the State, and the defendant intends to do so, and will submit to do so under the direction of the Court, and will enter into the obligations, which the law requires, that they shall not return, then let him thus answer, and that will terminate the plaintiff's claim.

The case of Cox v. Williams is a stronger authority than

the nature of this case demands. In North Carolina, the statute affirmatively prohibits the emancipation of slaves within the limits of that State, except in the mode and on the condition prescribed; but here there is no such statute. Yet the Supreme Court of that State have decided, that the policy of the statute is to protect the people of the State from the evils of free negroes residing there, and not to prevent the transportation of slaves for the purpose of emancipation abroad. And further, that the right to do this is a natural right, that can only be restrained by positive statutes enacted for the purpose of the prohibition. It is not the policy of our State to prohibit the transportation of slaves to another country, for the purpose of their liberation there from servitude. The Constitution authorizes the legislature to pass laws permitting the owners of slaves to emancipate them, saving the rights of creditors, and preventing them from becoming a public charge. This is a recognition of the abstract right and policy of emancipation; and a legislative act, regulating the subject in accordance with the suggestion of the Constitution, would place the right to send slaves to another country, to be emancipated, on the footing it occupies in North Carolina; and the decision under consideration would be conclusive, that then the right contended for would still exist here, until abrogated by a prohibitory statute. A constitutional authority conferred upon the legislature to regulate the exercise of a right, is an implied, if not an affirmative declaration, of the public policy of the right, it is surely a solemn recognition of the fact that it is not against public policy. A trust, then, created by will, for the transportation of slaves to another country or State, to be emancipated there, is valid upon principle and authority.

The decision of the Supreme Court of Tennessee, in the case of Fisher v. Dabbs, (6 Yerg. R. 119,) may be relied on as an authority against the removal of slaves to a free State, to be emancipated there; but it is not in point, and it should have no bearing upon the question. That case was decided by the local law of Tennessee, by which the sovereignty of the State

to assent to emancipation was conferred upon the judiciary; and it was thereby vested with as plenary power over the subject as the legislature itself possessed, and with the discretion to withhold the assent if conceding it would be inconsistent with the interest and policy of the State. This decision maintains that the Chancellor was the authorized deputy of the State of Tennessee, and in this capacity it lay upon him to adjudge whether it was consistent with the interest and policy of the State, that the slaves, who had devised to them their freedom by Peter Fisher, should be manumitted in conformation of the will. Vested with this omnipotent legislative power, the Court might well decide the cause upon its conceptions of the interest and policy of Tennessee, subject to no restraint except that of positive law, which would bind the legislature itself until repealed. It was upon the footing of this enormous power that that Court was authorized to go into the question of the interest and policy of the State, to carve out a rule of decision; and in the absence of this power, the Court would have been bound to decide the cause by the principles of existing law, however destructive they might have been to the interest and policy of the State. It is for the legislature to prescribe the law, and the judiciary to expound and administer it, according to its clear intent and meaning; and beyond this it cannot go, unless it is vested with the power of judicial legislation, as in Tennessee in the case under consideration.

The judiciary of the State of Texas is not the authorized deputy of the State, to give or withhold assent to emancipation, upon its judgment of the interest and policy of the State. It is not clothed with legislative power to declare State policy upon this or any other subject, and decide causes accordingly. Its sole province and authority is, to administer the law as it exists.

The Courts of Texas are not vested with the omnipotent jurisdiction exercised by those of Tennessee, in the adjudication of the case of Fisher v. Dabbs; nor has the legislature, by any statute or series of statutes, adopted as law, the principles of

that decision, for the government of the people of this State, or the determination of such causes. It is clear that the decision is not made upon the principles of the common law; and before it can be relied on as a precedent, to control the adjudication of like questions arising here, it must be shown that our Courts have by legislative enactment, the power conferred upon those of Tennessee, or that our legislature has adopted the principles there decided as the law of the State, or it must be admitted, that the Supreme Court of Tennessee has the right to dictate laws to us. Neither of the two former can be made to appear, and the latter is absurd.

The Court below did not err in undertaking to direct the execution of the trusts of Wethersby's will, for the security of the interest of the slaves. The case of Fisher v. Dabbs, and of Thompson v. Newlin, before cited, are conclusive upon this point. In the former, the Court departed from the statute, and decreed the terms upon which the emancipation could take place; and in the latter, directed the manner in which it might be done. The bequest of the sixteen hundred dollars, for the purpose of carrying out the will, as a trust for the benefit of the negroes, is fully sustained, as has been shown by the case of Cox v. Williams, and of Cameron v. Commissioners of Raleigh, before cited, and the case of Hope v. Johnson, (2 Yerg. R. 123.)

The Court below did not err in decreeing that if Mrs. Sherrod would not receive the negroes and sixteen hundred dollars as a special trustee, for the purpose of carrying out the testator's will as to the freedom of the negroes, it should be done by the executor, John L. Sherrod. It has been shown that in the event of Mrs. Sherrod receiving the negroes and money, under the will, she must take as trustee, and not as absolute owner; and that the estate in the negroes and money was a trust estate, and that the trusts were valid under the law, and that the Court had authority to direct their execution. Now, it is a well settled principle of equity, that a trust shall not fail for the want of a trustee; and that where the estate is

created, and no trustee is appointed, or if there is, and he re-
fuses to act, the Court will appoint a trustee, or take upon
itself the execution of the trust. (Fon. Eq. 429, 4 Amer.
Ed., and p. 171, former El. ; 6 Ves. p. 663. Story's Eq.,
Juris. Sec. 1060–1061.)

There can be no valid objection to the appointment of the
executor, John L. Sherrod, to act as trustee for the negroes
and of the fund, in the event Mrs. Sherrod should refuse to
act.   His appointment as executor by the testator, and the
grant of letters testamentary to him by the County Court, are
sufficient to commend him to the confidence of the Court.

On the part of the defendant in error, the whole case is now
submitted to the judgment of this tribunal.   All that he prays,
as party to the suit, is, a decree ascertaining and settling the
rights of the parties, and for his indemnity and protection, as
the executor of Wethersby's will.

LIPSCOMB, J.   The case has been argued with great ability,
and highly commendable industry and research, by the coun-
sel for both plaintiff and defendants ; and it is deeply to be
regretted that we are compelled to decide it, without the ad-
vantage of many cases, in which the points presented, or
analogous ones, have been discussed and decided by other
Courts similarly organized to our own.

The first point, insisted upon by the plaintiffs in error, is,
that the District Court had no jurisdiction ; that the the mat-
ters presented by the suit, belonged exclusively to the juris-
diction of the Probate Court.

We do not design to enter into an investigation of this ques-
tion, because it cannot be regarded as an open one.   This
Court has, from its earliest organization, held, that where the
matters presented by the petition were of such a character as
could not well be decided by the Probate Court, from its or-
ganization and the powers vested in it, the District Court, by
virtue of its general equity jurisdiction, could claim jurisdic-
tion.   It was so ruled at Galveston, after a review of all the

previous cases.   And in the State of Mississippi, where the jurisdiction of the Probate Court is very much like our own, the original jurisdiction of the Circuit Court was sustained in a case precisely like the present; (see Wade *et al.* v. American Colonization Society, 7 Smeedes & Marshall, 663; and also so ruled in Alabama.  (Trotter v. Blocker, 6 Porter, 269.) It was not the intention of the framers of our Constitution, nor will a fair interpretation of it bear the construction, that important rights should be denied a remedy for their enforcement, from a defect of jurisdiction, which would be the result, if in such cases, the general equity jurisdiction of the District Court could not be resorted to.   The argument, that it would not be a case without a remedy, even if the Probate Court could not afford the relief sought, as an appeal would lie, is not sound ; because it is well settled, that, on an appeal, if the Court *a quo* had not jurisdiction, it could not be revised by the appellate tribunal.   With these remarks, we will dismiss the question.

The next, and by far the most important objection urged, is as to the validity of the trust created by the will.   Is it a valid trust ?   Is it repugnant to the Constitution of the State, and the laws, and the policy of our institution of slavery ?   The plaintiffs insist that the first of these interrogatories should be answered in the negative, and the others, in the affirmative. We believe that it is clear, beyond controversy, that the bequest to Mrs. Sherrod, the sister of the testator, is coupled with the express trust, that the negroes should be carried to a free State, or to the colony of Liberia, where there would be no legal impediment to their enjoying their freedom, the object of the testator in making the bequest; and that this trust is a valid trust, unless it is in violation of the laws of this State, or contrary to the manifest policy of its institutions; these impediments out of the way, the owner of property has an undoubted right to dispose of it in his lifetime, or direct its disposition after his death, at his pleasure.   Before entering into the investigation as to how far this freedom of will in

the disposition of one's property is controlled by the Constitution and laws of this State, or its policy in reference to our institution of slavery, we will notice, and dispose of an objection, taken to the validity of the trust, arising from the rules of the Common Law.

It is urged by the counsel for the plaintiffs in error, that the trust is void, on the ground that the beneficiaries or *cestuis que trust*, as slaves, are incapable of taking; and to make the trust a valid trust, the beneficiaries must be in existence at the time of the creation of the trust, that is at the time of the testator's death. This position is enforced by the argument that the ownership of the property passes, directly on the death of the owner, into some one, and cannot be suspended; that slaves, as property, are incapable of taking at that time, and their subsequently being placed in a condition to take, cannot impart validity to the trust; and that on the failure of the trust, the property remained to the heirs as though no trust disposition had been made. These propositions and conclusions are certainly subject to many exceptions; they seem, however, to have been adopted, without qualification, by the Supreme Court of Alabama, further than the case of taking by descent, where the person not *in esse* may take on his coming into existence. (See Trotter, Adm'r, v. Blocker and Wife and others, 6 Porter, 269.) We apprehend, however, that this is not the only exception, and that one may take by deed, or by devise, who is not, at the time of making the deed or testament, in existence, provided the time for taking is not so remote as to create a perpetuity, and lock the property up from trade and commerce. A devise to a child to be born of a certain woman in being, would be a good devise, because not too remote, or beyond the limitation against perpetuities; which time has been established to be within the period of twenty-one years, and the ordinary period of gestation added thereto, after the death of a person then in being. And although before the time arrived, the property would be vested in the heir, if no trustee had been made, it

would only vest in the heir *sub modo*, to be divested on the happening of the contingency; and in holding the property, the heir would be regarded as holding subject to the trust.

We believe these views are fortified by the opinion of Judge Haywood, in the case of Hope v. Johnson, a case in its main features very much like the one before us, particularly on this question, where the very grounds we have been discussing were urged against the validity of a trust. The clause in the will creating the trust was as follows, i. e.: "I will and be-" queath, that the plantation I now live on be sold by public or " private sale, to the best advantage, and the proceeds there-" of be laid out in land in the Indiana Territory, as well situ-" ated as can be procured, and the right thereof vested in my " negroes which I now own, viz: (naming them) each or all of " them, with their increase, to whom I give their entire free-" dom ; and the settling of them on the above named land, un-" der the direction of my executor &c." Johnson, the Execu-tor, sold the land directed by the will to be sold for purchas-ing another tract in Indiana for their maintenance ; the ne-groes were carried by him to Indiana, where they now are emancipated and free. Judge Haywood, who delivered the opinion of the Court, says: "And the question now is, " whether such power, given to Johnson for such purposes, " was a good and legal power; which general question is sub-" divided by the argument into two more minute ones : First, " in whom the land vested till the sale ? Secondly, whether " the trust did not fail for want of persons capable to take it " when the testator died ?

"First, did the land vest in Johnson, so far as regards " the legal estate, in fee ? The land was not given to him to " use, but he was directed to sell. The legal estate did not " vest in him, but a power to sell ; and when he sold by vir-" tue of the power, and conveyed by it a fee, the purchaser " was in by and from the testator, by a title anterior to " that which came to the heir by descent; and this puts an end " to the claim of the heir, unless the power be void, it being

"for some illegal purpose." He then refers to the laws of Tennessee, to show that the purpose was not illegal, and proceeds: "Secondly, did the trust fail for want of persons to "take it? Suppose the direction had been to purchase land "in Indiana, for the use and benefit of a child of a free per- "son, which should be born in the lifetime of these negroes, "and such child should be born in their lifetime; the trust "would vest in him, such birth being within the time limited "to prevent perpetuities. So here, if the negroes be made "free at all, it must necessarily be in their lifetime, and the "estate will not be inalienable, waiting for the trust to attach, "beyond the time limited, and so is not void as tending to "lock up the estate in perpetual seclusion from the purposes "of commercial enterprise. If the trust be not void on ac- "count of its tending to a perpetuity, then the objects of the "testator's bounty were incapable to take in a reasonable time "after his death, though not capable at the time of his death "and before emancipation; and there is more reason that "they should take according to the will of the testator, than "that the heir should take against his express purpose that "she should not take. But it is said that the property vested "in Ann Hope, and could not afterwards be taken from her. "Answer: It vested in her *sub modo*, as it does by descent "to a more remote heir until a nearer be born: as, suppose it "vest in the brother of the deceased, and six or eight months "afterwards the wife of the deceased is delivered of an heir. "So here, the land vests in the heir until a purchaser comes "into *esse* under the power, and then in the purchaser, im- "mediately by and from the ancestor." (See Hope v. Johnson, 2 Yerger, 123.)

We have extracted nearly the whole of the opinion of the Court in the case just cited, because it was the unanimous opinion of a Court composed of seven Judges, all of whom justly deserve the reputation of being able Jurists; and of the Judge who prepared the opinion of the Court, it may well be said that, for learning and profound research into

the principles of jurisprudence, no one has enjoyed a more enviable rank. And further, although the Supreme Court of Alabama, in the case cited from 6 Porter, believed that this case did not lie in their way, and forbore the criticism to which they supposed it obnoxious, we believe that, in the particular branch of the case under consideration, it lies immediately in our way, and we see no escape from it, and yield our unqualified assent to it as a sound and clear exposition of the law on the question. Nor is it perceived how it could have been regarded by that Court, as not to lie in their way. One of the questions presented and discussed in that case, was, the validity of the trust at common law; and it was discussed and decided upon, (in the opinion of the Court,) on the application of the common law to it, and held to be invalid ; in fact, it was the same question we have been discussing. The Alabama Court, after arriving at the conclusion that the trust was void on that ground, need not to have proceeded further, as it disposed of the case, and their decision against its validity under the Constitution and laws of the State, were not at all necessary to the disposition of the case before them.— We shall, however, have occasion again to return to this Alabama case, in the discussion of the other branches of the case before us. We conclude that the trust conferred on Mrs. Sherrod by the will of her brother, was a good and valid trust at common law; and we shall next proceed with the inquiry, whether it was in violation of the Constitution and laws of the State, or repugnant to its policy.

In the 8th Art. of our Constitution, on the powers of the Legislature on the subject of slaves, in the 1st Section is the following, i. e.: "They shall have the right to pass laws to "permit the owners of slaves to emancipate them, saving the "rights of creditors, and preventing them from becoming a "public charge." This is the only provision in the Constitution having any reference to the subject of emancipation, and if the question of the right of the owner to emancipate his slave, unconditionally, depended upon any thing like a fair

judicial construction of this provision, it would be difficult to derive from it any such restrictive effect. The language does not assume to be restrictive on the owner. It gives authority to the Legislature to do, clearly what they would have had the power to do before or without it; for it cannot be doubted that it is competent for the Legislature, in view of our institution of slavery and for its protection, and better regulation, to impose such restrictions on emancipation, as, in the opinion of that department of the State Government, expediency or sound policy may require. If there is any restriction, it is found in the last member of the sentence, " saving the rights of creditors, and preventing them from becoming a public charge." This would seem to be restrictive to this extent, that they should not grant the permission without securing the two objects mentioned, the rights of creditors, and the public from being burthened and taxed with their support. Constitutions, as well as Acts of the Legislature, restraining the natural right of the owner to dispose of his property as he pleased, should be clearly expressed; the intention to do so should never be presumed. The mere fact that authority was given to the Legislature to pass laws permitting the right, cannot be construed as inhibiting a right previously existing. Had such been the object of the framers of the Constitution, they would have made use of language such as, " emancipation of a slave shall not be allowed to be made, " only by permission of the Legislature, or under such regu- " lations as shall be prescribed by the Legislature." If so expressed, there can be no doubt that it would have prohibited emancipation within the jurisdiction of the State. There is no aid to be derived, to support the conclusion, that the restriction is in the words of the Constitution *per se*, from the supposed analogy to the case of a jurisdiction being granted to a Court by the Constitution, under such regulations and restrictions as the Legislature might enact. In the last case, there would be no restraint on a right existing, if the exercise of the jurisdiction granted, was dormant and could not be ex-

ercised until the Legislature had acted. It is however most likely that the State Convention had in view the provisions of the Constitution of the Republic, and the Acts of Congress still of force, on the subject of emancipation and free negroes, and we consider it not improper to look to these sources to arrive at the meaning of the provision of the Constitution so vaguely expressed.

The Constitution of the Republic in Section 9 of the General Provisions, is in the following language: "All persons "of color who were slaves for life previous to their emigra-"tion to Texas, and who are now held in bondage, shall remain "in the like state of servitude: Provided, the said slave shall "be the *bona fide* property of the person so holding the said "slave as aforesaid. Congress shall pass no law to prohibit "emigrants from bringing their slaves into the Republic with "them, and holding them by the same tenure by which such "slaves were held in the United States; nor shall Congress "have power to emancipate slaves; nor shall any slaveholder "be allowed to emancipate his or her slave or slaves without "the consent of Congress, unless he shall send his or her "slave or slaves without the limits of the Republic." This organic law was superseded by the Constitution of the State, yet it may be referred to, not only to show the true meaning of the State Constitution, upon the same subject, but also the policy of the restriction, on emancipation; that it was only designed so far to restrict emancipation as to prevent free negroes from remaining in the State; and that this was the object is further manifested by the Act of Congress of the Republic (still believed to be in force) of the 5th February, 1840. (Articles from 2546 to 2550, inclusive, Hart. Dig.) This Act prohibits free negroes from emigrating to the country; provides how they shall be punished, and if persisting in remaining here, shall be sold as slaves for life. But it may be said that as the Act referred to does not mention or refer to emancipation in prohibitory terms, and the Constitution of the Republic being abrogated by the new government and its

new Constitution, there is nothing left to prohibit emancipation without any qualification; to which we answer, that as the Act is believed to be still in force, and it forbids free negroes from coming into the country, taken in connection with the old Constitution and the new, the prohibition of emancipation, unless the emancipated slaves shall be removed from the State, is implied, as their residence in the State is not permitted.

But if we admit that the State Constitution prohibits emancipation, would it follow that the owner would not be allowed to emancipate them, on their being removed from the State, or by testament provide for its being done after his death? In the States of Mississippi, Georgia, and South Carolina, they have no constitutional provision regulating or controling the right of emancipation; but in each of those States, they have legislative enactments, expressed in much stronger and more explicit terms, prohibiting the emancipation of slaves, or regulating the mode in which it must be done. We will see what has been the construction, in those States, of their respective Acts of the Legislature on this subject.

To begin with Mississippi, the Act of the Legislature, in restraint of emancipation, is as follows: "It shall not be lawful for any person or persons, being the owner or owners of slaves, to emancipate them or any of them, unless by his or her last will and testament, or by any other instrument in writing under his or her seal, attested and proved in the manner required by law by two credible witnesses, or the instrument of writing acknowledged by the party or parties in the Court of the County or Corporation where he, she or they reside; and also prove, to the satisfaction of the general assembly, that such slave or slaves have done and performed some meritorious act for the benefit of such owner or owners, or some distinguished service for the benefit of this State: and the last will and testament, or other instrument in writing, as aforesaid, shall not have validity until the same shall be sanctioned by an Act of the General As-

"sembly, nor until the owner or owners shall have complied "with the conditions which may be specified in such Act." In the case of Jane B. Ross *et al.* v. Vertner *et al.*, 5 Howard, 357, on the will of Isaac Ross without having observed the conditions prescribed by the statute cited, the part of the will contested by the next of kin, "Directs the executors of "the same to transport to the coast of Africa, such of the slaves "of the testator as shall elect to go; and there to be settled "in Liberia and remain free." It was held by the Supreme Court, that this was a valid trust, that it did not come within the policy of the statute above cited; the trust, although created by the will of the testator within the State, was to be executed without its limits; that the object of the law was to prevent free negroes remaining in the State. The case was argued by eminent counsel, and was one involving the freedom or slavery of about one hundred and sixty slaves. The doctrine of this case was considered as conclusive of the question, in Wade and others v. The Colonization Society, 7 Smeedes & Marshall, 663. And in the last case, it was further held, that a "bequest made to slaves, who are directed "by the will to be transported to Africa and remain there, are "not void for want of capacity in the legatees to take; the "slaves have an inchoate right to freedom under the will, "which is complete as soon as they are removed out of the "State."

We have been unable to procure an exact transcript of the Acts of 1801 and 1818, of the State of Georgia, but their purport, so far as it can be collected from the comments of counsel and the opinions of the Judges in reported cases, is that the manumission of slaves is absolutely prohibited, without the consent of the Legislature, and wills containing a direction, or provision manumitting them, are declared to be void. These statutes received the judicial construction of the Supreme Court of that State, in the case of Vance v. Crawford. (4 Georgia R. 445.) The contest arose on a clause in the will of Marshall Keith, as follows: "I give to the Secre-

tary of the Colonization Society the following negroes, viz:
Alfred, Daniel and Thornton, for the purpose of being sent to
Liberia, and also five shares of the Mechanics Bank of Au-
" gusta, for each—the proceeds to be paid to them or the sur-
" vivors, on their arrival in Liberia, and for no other purpose."
The Superior Court of Columbia county sustained the will,
and decided, " That the clauses of a will containing bequests
" of slaves and other property to executors as trustees for the
" use of the slaves, were not utterly void under the Acts of
" 1801 and 1818, unless it appeared to be the absolute inten-
" tion of the testator that the slaves should remain in Georgia."
On appeal to the Supreme Court of the State, this judgment
was affirmed.

Judge Lumpkin, who delivered the opinion of the Court,
says, " As to so much and such parts of the will as authorize
" the emancipation of three of the testator's slaves, in Liberia,
" we are clear, that it was entirely competent for him to
" make such *post mortem* disposition of his negroes.   Owners
" can, in their lifetime, carry or send their slaves to the coast
" of Africa to be colonized, or elsewhere, for the purpose of
" freeing them; and they can appropriate the whole or any
" portion of the remainder of their property, if they so please,
" to their transportation and maintenance in their new homes.
" We hold it equally certain that they can direct the same
" thing to be done by their executors, after their death.   For-
" eign emancipation conflicts neither with the letter or spirit
" of our municipal regulations, relative to this subject."

The same question again came up before that Court, in the
case of Carper v. Blakey, 10 Georgia R. 263.   Judge War-
ner, who delivered the opinion of the Court, says: " The ob-
" jections urged against the will of the testator, in this case,
" are precisely the same as were urged before this Court in
" the case of Vance v. Crawford, in opposition to the will of
" Marshall Keith.   It was held by this Court, in that case,
" that it is not against the policy of the State of Georgia, for
" the owner of slaves to remove them out of the State for

" manumission, and that he may direct it to be done, by will.
" In the case of Jordan v. The Heirs of Bradley, (Dudley R.
" 170,) the same decision was made by the Judges in conven-
" tion.   We have examined the question as decided in both
" of the cases above referred to, and, with increased confidence,
" re-affirm the judgment of the Court in Vance v. Crawford.
" In that case, as in this, there was a bequest to the slaves,
" by the testator, of a portion of his property, which was held
" to have been a valid bequest."

The Act of 1830 of the Legislature of South Carolina pro-
vides, " that no slave shall be emancipated but by Act of the
Legislature."   The case of Frazier et al. v. Frazier's Execu-
tors arose on a contest between the heirs of the testator and
his executors to invalidate the will of the testator.   The be-
quest sought to be invalidated was as follows, i. e. : " That the
" slaves of the testator should be hired out during the lifetime
" of his widow, and that after her death the whole of them
" should be set free by his executors, &c., the interest of the
" money is to enable them, with the assistance of Govern-
" ment, to go to St. Domingo to be colonized, or to any part
" that they with the Government may choose."   Upon the
death of the widow, the executors seized the negroes with the
view of carrying the will into effect ; and a bill was filed by
the next of kin claiming the negroes, &c.   The Court say
that although the provision is general and might seem to pro-
hibit emancipation out of as well as within the State by a
citizen, yet such construction would be manifestly contrary to
the spirit of the law.   The evil was the increase of free negroes
in the State, by emancipation.   The removal of slaves belong-
ing to citizens of the State, and their emancipation in parts
beyond her territorial limits, was no injury to her.   It will not
be denied, say the Court, that the owner might have remov-
ed his slaves from this State, at any moment and for any pur-
pose he pleased ; and it is laid down as a general rule to
which there is no exception, unless by express statutory pro-
vision, that the owner of property may, by his will, direct his

executors to dispose of it in any way in which he could. (2 Hill's Chan. R. 305.)

The principles deduced from these cases, are, that although a State by its Laws, may absolutely prohibit emancipation, or direct the particular mode in which it can only be done, yet a bequest of freedom not to be forfeited until the slave is removed beyond the territorial limits of such State, is nevertheless a valid bequest; and that a bequest to a slave is valid, if not to take effect until his removal from the State. The soundness of these principles has not been controverted by a single case we have had an opportunity to examine, with the exception of the case of Trotter v. Blocker *et al.*, cited before; and that case does seem to lie in our own way, and we must, therefore, examine it, and dispose of it as best we may. The provision in the Constitution of the State of Alabama, on which the opinion of the Court was given in the case referred to, is precisely in the language of our own previously recited; and the Court ruled that a bequest in the will, of freedom and removal from the State, was invalid; that the trust was in violation of the constitutional prohibition, and that emancipation could only be valid by an observance of the mode pointed out by the statute; that any other mode was repugnant to law, and void. It must be observed that the distinction between domestic and foreign emancipation, does not appear to have been noticed or discussed at all in that case; but it is assumed, that because the slave had not the capacity to take the bequest at the death of the testator, he could not take at all. A more critical examination would have enabled the Court to perceive the want of application to the case, of the rule it laid down, that if the donee is not capable of taking at the time of the gift, the gift is void. That rule only applies where the gift is to be completed *in presenti*, and not *in futuro*. In the case then before the Court, the bequest was not to take effect *in presenti*, but it depended, for its completion, on something to be done at a future time; and although the beneficiary was not capable, at the time of the death of the testa-

tor, he was capable of taking under the will, if capable at the time of the execution of the trust, if the time of the execution was not postponed beyond the time prescribed to prevent perpetuities. The time and place, when and where the trust is to be executed, must be looked at, and not the place where it was created; if not repugnant to law where it is to be executed, it is a valid trust. It may be said, that in a State where a contrary doctrine has been held from the ruling of the Court in the State of Alabama, they had no constitutional restraint on emancipation; to which we answer, that it is competent for the Legislature in those States to impose restrictions on emancipation, and all of them had imposed such restraints, and in most of them, much more stringent, than any construction of the Constitution of Alabama or of this State, would authorize. The laws of Mississippi and South Carolina, are particularly so. The error of the Court in Alabama, arises from not regarding the difference in where the bequest was made and the place it was to be consumated. We must, therefore, respectfully differ with the Supreme Court of Alabama, on this question.

On a full investigation of this case, and with the best light we have been able to derive from adjudged cases, we conclude that the trust to Mrs. Sherrod in favor of the testator's slaves to be executed beyond our territorial limits, is not repugnant to the law or settled policy of this State, and that it is a good and valid trust; and that there is no error in the decree of the Court below, and it is therefore affirmed.

Judgment affirmed.