## CURRY *et al.*, *vs.* CURRY *et al.*

1. Testator by the 2d item of his will says, " I give my servants, John a man, and Betsy, a woman of yellow complexion, to my executors hereinafter named, in trust to convey said negroes immediately after my death to some one of the non-slaveholding States of this Union, as the said executor may select, or to whomsoever said servants may elect for a master in this State before John T. Stephens:'' *Held*, to be in conflict with the Act of 1818 against manumission and void.

Caveat to Will, in Monroe Superior Court.   Tried before Judge CABANISS, August Term, 1859.

Peter M. Curry and others, heirs at law of Wiley Curry, deceased, filed their *caveat* to the probate of the second and fourth items of the last will and testament of said deceased, on the ground that said items were in violation of the statutes prohibiting the manumission of slaves, and were therefore void.

These two items are as follows :

" Item 2d.   I give my servants, John, a man of yellow complexion, and Betsy, a woman of yellow complexion, to my executor, hereinafter named, in trust to carry said negroes, immediately after my death, to some one of the non-slaveholding States of this Union, as the said executor may select, or to whomsoever said servants may elect for a master in this State, before John T. Stephens.

" Item 4th.   I desire my executor, out of any funds in his

hands, to pay John Goodman, my worthy and trusty friend, the sum of one thousand dollars, the interest on which is to be annually paid to my servants, John and Betsy, after their removal to a free State, by the said John Goodman, and at the death of said John and Betsy, said sum to be equally divided between their children. It is my will that five hundred dollars of said one thousand be considered in trust for said John, and five hundred for Betsy; if either die without children his share to go to the other—if both die without children, said sum to come back to my estate, and to be disposed of as the rest of my negroes are hereinafter disposed of. If said John Goodman refuses said trust, I desire my executor to make application to the presiding Judge of the Flint District for the appointment of some fit and proper person to said trust."

Upon the trial the *factum* or execution of the will was admitted, as also, that testator was of sound and disposing mind and memory.

Propounders then offered to prove that after the execution of the will, but before the death of the testator, the negroes, John and Betsy, informed said testator whom they would choose as their master, and testator expressed himself satisfied with their choice. Caveators objected to this evidence; the Court sustained the objection, and propounders excepted.

Caveators admitted that John and Betsy, the negroes named in the 2d item of the will, did a few days after testator's death, choose their masters, to-wit: John selected Willis Curry, Jr., as his master, and Betsy chose Mrs. Sarah Babcock as her mistress, and that the negroes were delivered to the said Willis Curry, Jr., and Sarah Babcock who paid nothing to the executors for them. They were not appraised as a part of testator's estate.

Propounders then offered in evidence the paper propounded as the will. Caveators objected to the second and fourth items being read to the jury, upon the ground that they were void and contrary to law. The Court sustained the objection and excluded said items, and propounders excepted.

The remainder of the will was read and submitted to the jury, who found the following verdict:

" We, the jury, find the paper propounded to be the last will and testament of Wiley Curry, deceased, except the second and fourth items of the same."

Curry *et al.*, *vs.* Curry *et al.*

Counsel for propounders moved for a new trial upon the following grounds :

1st. Because the Court erred in rejecting the evidence offered to prove the choice made by John and Betsy of their master, prior to testator's death, and his approbation thereof.

2d. Because the Court erred in holding that 2d and 4th items of the will of deceased, were void under the statutes prohibiting emancipation, and withholding them from the jury.

The Court overruled the motion for a new trial, and propounders excepted and assign said refusal as error.

JAS. S. PINKARD, for plaintiff in error.

PEEPLES & CABANISS, *contra.*

*By the Court*—LYON, J., delivering the opinion.

Is the second item in the will of testator void under the Acts of 1801 and 1818, prohibiting manumission of slaves in this State ?   And this is about the only question in this record for our consideration, as the other questions depend entirely on it.

Had the testator stopped with the gift to his executors of these slaves, in trust to convey them immediately after his death to some one of the non-slaveholding States of this Union, there is not a doubt but that the Court would have been bound by previous adjudications to have declared that this bequest was not in violation of those Acts, for whether such intended manumission is within the mischief intended to be remedied and prohibited by those Acts, it is quite clear, that the Courts from that day to this have steadily and uniformly declared in favor of the legality of such bequest.

It would be arrogant in me to say, that adjudications on this subject were wrong, even if it should be conceded that this was an open question.

But with the most profound respect for those eminent lawyers and high Courts, who made these adjudications, it is impossible not to feel that those decisions have left many grave questions not very satisfactorily answered, such as, is not such emancipation in conflict with the letter of those Acts? would not a deed, having for its purpose the same object in

view, to be enforced in the lifetime of the maker, be void ? or rather, could it be enforced in the Courts of this State? and if so, by whom, and at whose instance? If the executor in a will having this provision should refuse to execute it, or the slaves should refuse to go, how could it be enforced ? It will not do to say that it can be done upon the application of the slave, or on his behalf, for as a slave he has no civil right, and no legal capacity whatever. If the slave takes any interest whatever, under the will, it is that with which it intends to invest him with freedom. He takes all or nothing. It requires all that to enable him to assert his rights, and if the will confers that on the slave, it is void. Again, would not the great object of the law and its true policy, have been better promoted by a different ruling? It is too late at this day to inquire whether that interpretation is the true one or not, for those decisions of the Courts, right or wrong, have for me, at least, all the force of a positive enactment, and so the Court holds.

But this testator goes one step farther, after directing his executors to convey said slaves, immediately after his death, to some one of the non-slaveholding States of this Union, as the executor may select, he adds, "or to whomsoever said servant may elect for a master in this State before John T. Stephens."

Does this alterative direction of the testator afford a sufficient evidence on his part to violate the provisions of the laws of this State, prohibiting the manumission of slaves as will require this Court to pronounce this item void ? We think that it does, and I now proceed to give the reasons for that conclusion. Whenever the intention of the testator is to give an estate in the negroes mentioned different from what the Act of 1818 admits, the bequest is void.

The Acts of the Legislature against manumission look to the prohibition of all manumission, and of all attempts to effect it either directly or indirectly. The intention of the Legislature was to prohibit qualified manumission—to prohibit owners from placing them in a situation where, according to law, they would be pronounced slaves, yet would be entitled to some of the rights and immunities of freemen : *Robinson & Wood vs. King,* 6 *Ga.,* 547.

The negroes, John and Bestsy, are the entire object of the bounty of the testator, as expressed in the 2d item of his

Curry *et al.*, *vs.* Curry *et al.*

will. His first direction to his executor is, "to convey them to some of the non-slaveholding States," for what purpose is not expressed. It is only from construction that we conclude even as to this clause of that item, that he intended that the negroes should be free on reaching the State selected. We know that the negroes could not reside in one of the non-slaveholding States as slaves, hence we conclude that testator's intention was that they should be free. Had the clause gone no further, as I have said, this Court would have been compelled, under previous adjudications, to have given effect to the bequest. But it goes further, the executors are directed to "convey the negroes to whomsoever the said servants may select for a master in this State." For what purpose, to be slaves in fact, or in name only ? How is the title to vest in such unnamed, unknown and indifferent personage? All this is left to conjecture, presumption and construction. We are told that inasmuch as testator used the words '*convey*' and '*master*,' he meant that such person as the slaves might elect for a master should take the negroes under the will absolutely and forever as slaves, in fact and not *pro forma;* that such person would take the negroes and their natural increase, as slaves, to himself and his heirs forever. And we must presume all this to have been the intention of testator, by the words employed, to sustain this item of his will. Taking this whole item together, (and we must do so to get the intention, for it has reference to but one subject, and but one object in view, and must all stand or fall together,) can we presume or conclude that such was the intention of the testator ; that is, that the person elected by the negroes, for their master, should sustain to them only the ordinary relations that exist between master and slave, with the right and power to sell, barter, give, or use them in any and every way he thought proper as slaves? Such presumption or conclusion is not at all consistent with the intention of testator towards these negroes, as is manifested in every word of that item of his will. It would defeat the whole object of the bequest; that is, to confer a real or supposed benefit on the negroes manifested by giving them this extraordinary power. The intention of testator was that these negroes should be free, wherever they might be, either here or in a non-slaveholding State. They were the objects of his bounty—not the person they might elect for a master. What was the inducement to

him to give these negroes to the persons they might elect for a master? It was in the power given to the slaves, and possible for them in their choice, to elect persons in no wise related, or even acquainted with testator. The bequest gave, as it was intended, the widest possible range within the State to make their election, and no matter upon whom it fell, however unworthy or unknown to testator, the conveyance and title followed as a necessary conclusion. Such person could not have been the object of testator's bounty. It was for no benefit to such *elect* that this bequest was made, but it was for the benefit of the negroes wholly and solely, and the inducements or consideration moving the conveyance to the elect was such contract or agreement as the negroes might make with such persons that would but promote and subserve the great leading object of that bequest, by giving to the negroes John and Betsy, the largest possible freedom without actually being free.

The bequest was in fact, placing a charter of the liberty of these negroes in their hands to go throughout the State and trade and traffic on it until such person should be found who would give them the largest liberty for the least consideration; one in whom they could confide, who would hold them nominally as slaves, while for all practical purpose they would be free. There is no time fixed within which they must elect. In the interim, what is their condition, slaves or free? Neither the one or the other—*quasi slave—quasi free.* It cannot be doubted but that such a condition is obnoxious to the provisions of the Act of 19th Dec., 1818. Look at the intention of the Legislature expressed in the preamble to that Act: "*And whereas,* divers persons of color, who are slaves by the laws of this State, having never been manumitted in conformity to the same, are nevertheless in the full exercise and enjoyment of all the rights and privileges of free persons of color, without being subject to the duties and obligations incident to such persons, thereby constituting a class of people equally dangerous to the free citizens of this State, and destructive of the comfort and happiness of the slave population thereof, which it is the duty of the Legislature by all just and lawful means to suppress." By this will these negroes are slaves, yet they are in the full exercise and enjoyment of all the rights and privileges of free persons of color, without the burdens. They have a higher and greater

right than the free negro, for the social right and legal capacity of election to be free is in their hands. I cannot imagine a condition of the negro more hurtful to a proper and necessary regulation of the slave population, or one more obnoxious to the provision of the Act. Should such a bequest be sanctioned by this Court as a legal disposition of these slaves, there would be no end to which the system would be carried. As emancipation is now prohibited by statute, whether to take effect in or out of the State, this plan would be instantly laid hold of and followed as a happy expedient by persons, who, from improper relations with these slaves, or from other causes, desire after their death that the condition of the slaves should be altered, until a large class of this sort of population will be established throughout the State, obnoxious to the laws, dangerous, mischievous and corrupting to the slaves. New legislation would be required to abolish the system, not to eradicate the evil, for that would be impossible. The effect would continue, like free negrodom, a perpetual blight on the institution.

How much better is it to strike at the evil as we do here, while it is yet in the bud, and break it up, root and branch, before it has laid a basis for its own propagation.

Should we be mistaken in this view of the question, there are other reasons why this bequest is void.

This bequest, as I have already shown, is a gift to the slaves themselves, and is void for that reason ; for, as slaves, they have not the capacity to take property, either by purchase or descent. In *Watters vs. Blocker*, 6 *Porter* 269, *Collier*, *C. J.*, says, " If the bequest of freedom be considered as a legacy to the slaves, it cannot be maintained, for being themselves in servitude, they have not the capacity to take property by purchase or descent. As it regards their transmission from owner to owner, they are considered as personal property, and rather as things than persons. It is essential to every gift that there should be a donor, a donee, and a thing given ; the donee must have capacity to take and to hold ; when he has neither, the conveyance is absolutely void. If a devisee has not capacity to take when the estate ought to vest, the devise is void. A slave cannot hold property, and the holding for him is illegal, whether by trust or otherwise." If it be said that the slaves are not the donees of themselves, but their *elect* is, we answer that then the bequest

would be void for uncertainty, if not otherwise obnoxious to the emancipation laws of the State.

But again: As slaves they could not elect; they have no legal capacity to exercise such power, that is, the privilege and the right of a freeman, and the testator could not clothe them, as slaves, with any such power or capacity; and the attempt to do so makes the bequest void. The manumission laws of Alabama are very much like our Act of 1801—they do not go as far as that of 1818. There is nothing in the Acts of that State resembling the preamble I have herein extracted from the preamble of the Act of 1818. Notwithstanding, such a bequest would be void in Alabama. In *Carroll & Wife vs. Brumby*, 13 *Ala.*, 102, the testator in the clause of the will before the Court says, "In relation to my kind and faithful servants, Jane, etc., it is my will that they be permitted to go Africa, their passage paid, and two years support allowed, etc. If however, my said servants prefer to remain subject to my said daughter as they are to me, they may be permitted to do so, but in no event shall they be sold or deprived of their privilege before or after the death of my daughter."

The Court held the bequest to be void, saying, "It is true that the testator did intend to give them the option of freedom or servitude, but they (the slaves) have not the legal capacity to choose: the slave has not capacity to accept."

Such a bequest as this would be void under the statutes of Virginia, although that State not only does not have such a stringent policy or spirit in regard to the manumission of slaves, either partial, absolute, or mixed, as is contained in our Act; but manumission by deed or will is expressly allowed, by positive enactment. In *Baily vs. Poindexter*, 14 *Grat.*, 132, testator provided in his will that the slaves loaned to his wife for life should have their choice of being emancipated or sold publicly. The Court, in that case, held that the emancipation of the slaves was made by the will to depend on their election to be free. *And as slaves have no legal capacity to choose, the provision is void, and of no effect.* DANIEL, J., delivering the judgment of the Court, page 197, says: "When we assent to the general proposition, *as I think we must do,* that our slaves have no civil or social rights; that they have no legal capacity to make, discharge or assent to contracts; and that a slave cannot take anything

under a decree or will except his freedom, (allowed by the laws of that State—forbidden by ours), we are led necessarily to the conclusion that nothing short of the exhibition of a positive enactment, or of legal decisions having equal force, can demonstrate the capacity of a slave to exercise an election in respect to his manumissions. Any testamentary effort of a master to clothe his slave with such power is an effort to accomplish a legal impossibility. No man can create a new speceis of property unknown to the law. No man is allowed to introduce nomalies into the ranks under which the population of the State is ranged and classified by its constitution and laws. It is for the master to determine whether to continue to treat his slaves as property, as chattels, or in the mode prescribed by law, to manumit them, and thus place them in that class of persons to which the freed negroes of the State are asssigned. But he cannot impart to his slaves, as such, for any period, the rights of freedmen. He cannot endow, with powers of such import as are claimed for the slaves ; here, persons whose *status* or condition in legal definition and intendment exists in the denial to them of any social or civil capacity whatever." MONCURE, J., who dissented from the judgment of the Court in this case, admitted broadly that the slaves have no civil rights or legal capacity, but he put his dissent on the ground that the emancipation was the act of the master, and not of the slave; that *that* was the intention of the testator, and as it was a legal one, the Court should endeavor to effectuate his intentions.

In *Williamson vs. Coalter*, 14 *Grat.*, 394, testatrix, by her will, says : "I direct, in regard to the balance of my negroes, that they shall be manumitted on the first day of January, .1858." She then directs her executors to raise a fund out of her estate sufficient for the purpose, and use it in settling her said slaves in Liberia, or any other free State or country in which they may elect to live, and then says : "And I further direct that if any of my said servants shall prefer to remain in Virginia instead of accepting the foregoing provision, it is my desire that they shall be permitted, by my executors, to *select* among my relations their respective owners." In that case, the very one here, although the testatrix had the power to emancipate by will, and although she directed an unconditional manumission at a certain time, with only a condition subsequent allowing them to waive the

provisions in their favor, the Court held, upon great argument and consideration, "That the freedom of the slaves is made dependent *on their election,* and they having *no legal capacity to elect,* the will is ineffectual to emancipate them." It may be contended that, although this clause of the second item of this will is void, yet, the direction to convey the negroes to a non-slaveholding State is not, and while the Court should declare the one to be void, it should give effect to the other.

To this, there are two replies : One is, that the clause void serves to demonstrate to the Court the intention of the testator in his entire scheme as to the *status* of these negroes, and that being to violate or elude the provisions of the manumission laws of this State, the whole scheme is void. The other one given by Allen, J., in *Williamson vs. Coalter*, 14 *Grat.*, 398 : "No one has the right to say, or can say, what would have been the disposition of the testator if he had known he could not submit the alternative to the choice of slaves."

If, then, such testamentary disposition would be void under the existing laws of Alabama and Virginia, how much stronger and more forcible are the reasons for its being void under the stringent, precautionary enactments on this subject in the State of Georgia, especially when the law itself makes it the stern and imperative duty of all the Courts and Judges of the State in the strong language that glares in the face of every Judge who passes on these questions : "So to construe the several provisions thereof as to carry the same into full and complete operation, according to the true spirit, intent and meaning thereof as declared in the preamble to the same."

It could make no difference in the legal effect of the clause, that the testator knew before his death, and after the making of the will, that the slaves had made their election, unless the testator had acted upon that fact by making the bequest directly to such persons. Had he done so, the will would not have been before us. It is upon the will as it is, and as it was made, that we pass.

Of course the bequest of one thousand dollars in trust, for the use of these negroes, falls with the clause in their favor, and for the same reason, and for the additional one that this bequest was not to operate in their favor until after they reached a non-slaveholding State.

So the judgment stands affirmed.